In the
United States Court of Appeals
For the Seventh Circuit

No. 98-4094

In Re:  Diana Lynn Harvey,

Debtor-Appellant.


Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:98-cv-182--William C. Lee, Chief Judge.


Argued April 13, 1999--Decided May 2, 2000


  Before Kanne, Rovner, and Diane P. Wood, Circuit
Judges.

  Diane P. Wood, Circuit Judge.  At the time Diana
Harvey filed for protection under Chapter 13 of
the Bankruptcy Code in September 1996, she owed
$16,165 to General Motors Acceptance Corporation
for her 1993 Oldsmobile Cutlass Supreme.
Unfortunately (at least for GMAC), the car was
then worth only $9,500. GMAC had a perfected
security interest in the car, but the disparity
between the value of the asset and the total
amount of the debt made it an unsecured creditor
to the tune of $6,665.

  This case concerns the practice known in the
typically colorful bankruptcy jargon as "lien
stripping." Harvey argues that under the terms of
the Chapter 13 plan approved by the bankruptcy
court, she was entitled to have the lien on the
car removed as soon as she paid back the $9,500;
GMAC offers a number of reasons why that should
not be the case and its lien should continue
until the termination of the bankruptcy
proceeding or the satisfaction of the full debt,
whichever comes first. The district court agreed
with GMAC, but we find that GMAC's failure to
protect its rights in a timely fashion requires
us to reverse.

I

  Harvey filed for protection under Chapter 13 of
the Bankruptcy Code on September 20, 1996. GMAC
was an "undersecured" creditor, because its
security interest in the vehicle covered only
$9,500 of the $16,165 debt. Under sec. 506(a) of
the Bankruptcy Code, 11 U.S.C. sec. 506(a), GMAC

was entitled to an allowed secured claim of $9,500 and an unsecured residual claim of $6,665.

Accompanying Harvey's petition for bankruptcy relief were two documents that are the source of the controversy here. The first was a three page document to which the parties refer as the "long form plan." It proposed a weekly payment of $128 for five years (or until the general unsecured claims were paid). It also set payment priorities for the plan. Section 2(B) of the plan, which appeared on the first page, provided that GMAC's $9,500 secured claim was to be paid prior to its $6,665 unsecured claim. The same section that preserved GMAC's priority specifically mentioned the lien that GMAC retained on Harvey's Oldsmobile. Through the following language, this section provided for the stripping of the lien: "[u]pon payment of the allowed secured claim as indicated, any lien held by GMAC on said vehicle shall be void and title to said vehicle shall be released to Debtor." Finally, the plan arranged for priority payment to another secured lender as well as to holders of claims entitled to priority under 11 U.S.C. sec. 507.

Along with this detailed proposal, Harvey submitted a single page document (the "short form plan") that, from all appearances, summarized the terms of the longer form. It, too, established a $128 weekly payment for a five year period. It then stipulated that the order of payments would be (1) secured claims, (2) sec. 507 priority claims, and (3) unsecured claims. Unlike the long form, it did not mention the cancellation of GMAC's lien after Harvey had finished paying for the secured portion of GMAC's claim. Instead, it said only that "[h]olders of allowed secured claims shall retain the liens securing such claims" and was silent about the treatment of a lien after the allowed secured claim was paid in full.

Harvey's plan was confirmed on November 27, 1996, without objection--including, most importantly for our purposes, any objection to the lien-stripping provision. She began making payments shortly thereafter, but in February 1997 she requested and received a temporary suspension while she was on maternity leave. This suspension was to last until May 30, at which point Harvey was to continue repayment. Instead, she again fell behind, and on January 15, 1998, she filed an Application to Modify and a First Modified Chapter 13 Plan. The new proposed plan would have reduced her weekly payment by $8 from $128 to $120, but it made no change in the treatment of GMAC's lien spelled out in the November 1996 plan.

It was at this juncture that GMAC first objected to the lien stripping terms of the plan. GMAC claimed that it had never received page one of Harvey's original long form plan, which was where section 2(B) was to be found. The bankruptcy court must have found this a strange assertion, since the numbers "2" and "3" that appear prominently on the bottom of the pages of that GMAC conceded it received should have put it on notice that something was probably missing. In any event, the court found that GMAC received both plans in their entirety. Since GMAC does not argue on appeal that this finding was clearly erroneous, we take as an established fact that it received all of Harvey's original long form plan.

Nevertheless, on consideration of Harvey's motion to modify her plan, the bankruptcy court decided to construe the long form and short form as creating two distinct plans. Next, it decided not to apply the usual rule precluding a collateral attack on a confirmed plan, because it could not tell which plan was confirmed. This confusion, the court believed, was Harvey's fault, because she did not make it clear on September 20, 1996, whether the court was confirming the long or the short plan. Applying the principles that bankruptcy plans are to be treated as contracts and interpreted under state law, see Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 588 (9th Cir. 1993), and that ambiguity in a contract should be construed strictly against the drafter, see Fresh Cut, Inc. v. Fazli, 650 N.E.2d 1126, 1132 (Ind. 1995), the court decided that Harvey should bear the consequences of any uncertainty about which plan was confirmed. And those consequences were dire: if the confirmed plan had been the short form version, there was no lien-stripping provision and Harvey had no case. This rationale led the bankruptcy court to grant GMAC's motion to dismiss the action. The district court affirmed, agreeing with the bankruptcy court's ambiguity analysis and concluding that if Harvey could extinguish GMAC's lien prior to completion of her payment schedule, it would undermine the purposes of Chapter 13.

II

The practice of lien stripping gives rise to a set of difficult questions under bankruptcy law. Whether lien stripping over a creditor's objection is permitted prior to the completion of a Chapter 13 plan remains an open question. See, e.g., In re Talbot, 124 F.3d 1201, 1209 n.10 (10th Cir. 1997). GMAC argues that it should not be permitted, relying principally on the Supreme Court's analysis of Chapter 7 of the Bankruptcy Code in Dewsnup v. Timm, 502 U.S. 410 (1992),

which held that a Chapter 7 debtor could not strip down its creditors' liens on real property to the value of the collateral. In GMAC's view, there is no reason to treat Chapter 13 and personal property differently. Were the opposite rule to prevail, GMAC foresees abusive debtor practices: a cagey debtor could begin under Chapter 13, strip a creditor's lien, then convert to Chapter 7 as allowed by 11 U.S.C. sec. 1307 and thwart the Dewsnup rule. Lien stripping would also, in GMAC's opinion, undermine its rights under sec. 349 of the Bankruptcy Code, under which its lien is reinstated in the event Harvey's case is dismissed.

Harvey counters by pointing to 11 U.S.C. sec. 1322(b)(2) (allowing a modification of the secured creditors' rights) and sec. 1325(a)(5) (allowing confirmation of plans that protect allowed secured claims), which she thinks can be read together to allow lien stripping. She further notes that there is no policy problem here since, under her plan, GMAC gets everything that it has a right to expect. If, instead of restructuring under Chapter 13, Harvey simply defaulted, GMAC could seize the car and get $9,500. Harvey would then still owe $6,665 (assuming a deficiency judgment were allowed). GMAC would collect its $6,665 along with all of the other unsecured creditors. Harvey notes that her plan produces precisely the same result-- GMAC retains the lien on the car until it receives $9,500, at which point it joins all of Harvey's other unsecured creditors and hopes for the best.

III

It is a well-established principle of bankruptcy law that a party with adequate notice of a bankruptcy proceeding cannot ordinarily attack a confirmed plan. 11 U.S.C. sec. 1327(a). See also In re Greenig, 152 F.3d 631, 635 (7th Cir. 1998); Spartan Mills v. Bank of America Illinois, 112 F.3d 1251, 1255 (4th Cir. 1997); Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995). The reason for this is simple and mirrors the general justification for res judicata principles--after the affected parties have an opportunity to present their arguments and claims, it is cumbersome and inefficient to allow those same parties to revisit or recharacterize the identical problems in a subsequent proceeding.

This is especially true in the bankruptcy context, where a confirmed plan acts more or less like a court-approved contract or consent decree that binds both the debtor and all the creditors. Bringing the various creditors' interests to the table once is difficult enough; permitting one of

the creditors to launch a later attack on a confirmed plan would destroy the balance of interests created in the initial proceedings.

To avoid this problem, GMAC asserts that the very filing of two plan documents (the long form and the short form) created an ambiguity with respect to lien treatment that, under Indiana contract law principles, should be construed against Harvey because she drafted the documents. The first problem with this argument is that it assumes that Indiana law is the proper referent for a bankruptcy plan. This is the approach the bankruptcy court took, following the Ninth Circuit's decision in Hillis Motors, Inc., 997 F.2d at 588. We are not at all sure this is correct, however, in light of the federal nature of bankruptcy, the strong need for uniformity of approach, and the analogy one could draw to the treatment of federal court consent decrees. On the last point, see, e.g., Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 574 (1984); United States v. ITT Continental Baking Co., 420 U.S. 223 (1975). It seems more likely to us that something analogous to the four-corners principle that applies to federal consent decrees ought to govern interpretation of plans confirmed by the bankruptcy court. Nevertheless, the parties have not made an issue of this point in the present case, nor do we think that application of the four-corners principle or some other federal rule would make a difference to the outcome; we therefore leave further exploration of this problem to another day.

Even if ambiguity in the identity of the plan that was confirmed were enough to trump the bankruptcy principle of repose, this is not the case for applying such a rule. Harvey's short form tracks the long form in all material respects. More importantly, there is a fundamental defect in GMAC's case. GMAC failed to lodge a proper objection to the existence of the two plans before the bankruptcy court acted. GMAC argues that this lapse did not lead to waiver of its position here, because Harvey caused the confusion. It contends that since both the short and long forms were entitled "Chapter 13 Plan" and both were signed by Harvey, it could not be sure which of the two plans Harvey was actually submitting for confirmation. But we do not see why Harvey's initial responsibility for the existence of the two plans relieved GMAC of the duty of pointing out the problem to the court. The general rule is that a party in contract litigation must raise all claims--including those related to ambiguity--during the first litigation concerning that contract. See, e.g., Xantech Corp. v. Ramco Industries, Inc., 159 F.3d 1089, 1092 (7th Cir. 1998); Packer, Thomas, & Co. v.

Eyster, 709 N.E.2d 922, 928 (Ohio App. Ct. 1998); Johnson v. Anderson, 596 N.E.2d 1146, 1148 (Ind. App. Ct. 1992). By analogy, GMAC's opportunity came and went when it first had notice of the alleged ambiguity about which plan was really confirmed and what its terms may have been. GMAC could have raised the same points that it now asserts during the original confirmation proceedings.

If GMAC was genuinely uncertain about the combined effect of the short and long forms (a total of four pages), it was obligated to raise this issue with the bankruptcy court prior to the original plan confirmation. (Note that even under GMAC's rejected excuse that it did not receive page 1 of the long form, it is still clear that GMAC knew that more than one form was before the court, because it received pages 2 and 3. Its duty to object thus arose even on its own view of the facts.) As the bankruptcy court noted in In re Haynes, 107 B.R. 83, 86 (Bankr. E.D. Va. 1989), "[i]t is obvious, however, that a creditor should seek to resolve any ambiguities, regardless of how slight, in view of [the binding effect of a confirmed plan.]" An objection would have allowed the bankruptcy judge to evaluate the submissions and to decide whether it had one plan with a summary, or two distinct plans.

Forcing parties to raise concerns about the meaning of Chapter 13 filings at the original confirmation proceedings does not impose an unreasonable burden on bankruptcy participants. Quite the contrary--it is perfectly reasonable to expect interested creditors to review the terms of a proposed plan and object if the terms are unacceptable, vague, or ambiguous. As this court said in In re Pence, 905 F.2d 1107, 1109 (7th Cir. 1990), a creditor is "not entitled to stick its head in the sand and pretend it would not lose any rights by not participating in the proceedings." See also In re Andersen, 179 F.3d 1253, 1257 (10th Cir. 1999) ("A creditor cannot simply sit on its rights and expect that the bankruptcy court or trustee will assume the duty of protecting its interests."); In re Szostek, 886 F.2d 1405, 1414 (3d Cir. 1989) (stating that creditors must take an active role in protecting their rights). Nor is this a situation like that presented in In re Escobedo, 28 F.3d 34 (7th Cir. 1994). As the Escobedo court made clear, its refusal to apply res judicata principles in that case resulted from the fact that the debtor's original plan failed to comply with the mandatory provisions of 11 U.S.C. sec. 1322(a)(2). The modification of a secured creditor's rights--the issue here--is allowed but not required under sec. 1322(b).

The district court suggested that the only result of Harvey's decision to file multiple documents was to confuse the court and potential creditors. Perhaps this is true. Or perhaps, as Harvey suggested at oral argument, some trustees prefer the short form in order to facilitate easy case management and recordkeeping. Maybe the simultaneous filing of a short and a long form is helpful in many cases but inappropriate in Harvey's case. Or maybe this practice is always useless at best, confusing at worst. No matter-- the point is that GMAC had to raise these arguments at the initial confirmation proceedings since it already had notice of the ambiguities on which it now hopes to rely.

We do not mean to suggest that a party may never claim in a subsequent proceeding that a provision of a Chapter 13 plan is ambiguous and should be read one way or another. It may be the case that an approved plan contains a term that raises an unexpected problem at some point in the future. No party to a bankruptcy plan confirmation proceeding can be expected to envision every foreseeable circumstance that could require a court to construe a particular plan provision. Here, in contrast, the ambiguity about which GMAC was complaining was one that was readily identifiable during the original confirmation proceedings. After all, as GMAC points out, 11 U.S.C. sec. 1321 requires submission of "a [singular] plan." A debtor is not allowed to have two plans confirmed; thus, the question whether Section 2(B) of the long form was part of the plan to be confirmed was a problem that should have been apparent to any reasonably diligent creditor.

In sum, we hold that if GMAC had doubts as to what plan was being confirmed in the 1996 proceedings, it should have alerted the bankruptcy court to the ambiguity at that time, not 16 months later. We add that our resolution of this appeal on waiver grounds makes it unnecessary for us to express an opinion on whether GMAC could have been forced to accept lien stripping in a Chapter 13 proceeding over its objection; we leave that complex subject for another day. The judgment of the district court is

REVERSED.