**In re Alonzo COMMINGS and Joann Commings, Debtors.**

**No. 02 B 42477.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

July 31, 2003.

---

Thomas M. Britt, Tinley Park, IL, Attorney for Debtors.

Richard Owens, Evanston, IL, Attorney for National Indemnity Corporation.

### MEMORANDUM OPINION AND ORDER

A. BENJAMIN GOLDGAR, Bankruptcy Judge.

This case is before the court on the motion of National Indemnity Corporation

("NIC") to modify the automatic stay pursuant to 11 U.S.C. § 362(d). After the debtors failed to pay property taxes on certain rental property they own, the taxes were "sold" to NIC, and the debtors failed to redeem the property. NIC seeks to have the stay lifted to allow it to obtain a tax deed to the property in state court.

The case is thus another in a series involving the "muddled" relationship between Illinois property tax collection and bankruptcy law. IICLE, *Real Estate Taxation* § 5S.73 at 5S–15 (Supp.2001). Not only has that relationship "caused considerable confusion," *In re Bates*, 270 B.R. 455, 461 (Bankr.N.D.Ill.2001), it has divided the bankruptcy court. The decisions differ principally over two questions: first, whether under bankruptcy law a purchaser of delinquent property taxes is a "creditor" with a "claim" in the property owner's bankruptcy; and second, if so, whether the claim must be paid in full during the state law redemption period (extended by 11 U.S.C. § 108(b)) or can be paid in installments through a chapter 13 plan.

As discussed below, the court concludes that a tax purchaser like NIC is indeed a "creditor" with a "claim" in the bankruptcy. Because of a procedural wrinkle, however, the court need not consider whether such a claim must be paid in full during the redemption period or can be paid through a chapter 13 plan. The debtors' plan in this case proposed to pay NIC's claim as a secured claim, and the plan was confirmed without objection from NIC. NIC is bound by the confirmed plan and cannot attack it now. *See* 11 U.S.C.

§ 1327(a). NIC's motion to modify the stay will therefore be denied.

### 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1334(a) and 157(a), and the district court's Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(G) and (L). *See Bates*, 270 B.R. at 459. This opinion accordingly contains the court's findings of fact and conclusions of law.

### 2. Background

NIC's motion was fully briefed and argued. The following facts—which the parties agree are undisputed—are drawn from the briefs and exhibits, the arguments of counsel, the debtor's bankruptcy petition, and the court's own docket.

#### a. The Debtors and their Property

The debtors, 60–year old Alonzo and Joann Commings, are married and live in Country Club Hills, Illinois. In addition to their residence in Country Club Hills, they own rental property in Chicago. The debtors did not pay their 1998 property taxes (apparently amounting to $1,060.41)[1] on the rental property, and on April 26, 2000, Cook County "sold" the taxes to NIC.

#### b. Illinois Property Tax Collection

Illinois employs an intricate property tax collection scheme under which a third party can pay a property owner's delinquent taxes. If, after notice and the passage of a "redemption period," the owner still has not paid the taxes, the third party can acquire the property.[2] Because this Byzantine scheme is treated extensively

---

1. The $1,060.41 figure comes from an "Estimate of Cost of Redemption" issued by the Cook County Clerk. The Estimate lists "taxes sold" as $1,060.41.

2. Because third party tax purchasers are able to acquire properties for a song, this scheme "strikes many as harsh." *Rosewell v. Chicago*

*Title & Trust Co.*, 99 Ill.2d 407, 411, 76 Ill. Dec. 831, 459 N.E.2d 966, 968 (1984). But the scheme "was never designed to do equity." IICLE, *Real Estate Taxation*, § 5.68 at 5–79 (1997). It was designed "to ensure the collection of tax revenues." *Id.*

elsewhere, *see In re McKeever*, 132 B.R. 996, 1005–08 (Bankr.N.D.Ill.1991); IICLE, *Real Estate Taxation* §§ 5.1–5.149 (1997), only a brief outline is necessary here.

On January 1 of each year, an *in rem* lien securing payment of property taxes levied in that year attaches to real property in Illinois. 35 ILCS 200/21–75 (2002). The lien's priority is "sweeping," IICLE, *supra*, § 5.2 at 5–10: the lien is deemed a "prior and first lien" that is "superior to all other liens and encumbrances," 35 ILCS 200/21–75 (2002), except for certain federal interests, IICLE, *supra*, § 5.3 at 5–10. If the property owner pays the taxes, the lien is extinguished. *Id.*, § 5.5 at 5–10. If he does not, the county can recover the taxes through five kinds of "tax sales." *See McKeever*, 132 B.R. at 1005–06; IICLE, *supra*, §§ 5.26–47.

Of these, the most common (and the kind involved here) is the "annual tax sale." *See* 35 ILCS 200/21–190 *et seq.* (2002). After the county collector applies for, and the state court enters, a judgment and order of sale, 35 ILCS 200/21–175 (2002), the county offers the property for sale at a public auction, 35 ILCS 200/21–190 (2002). But the "auction" does not resemble the proceeding that the term usually brings to mind. Prospective purchasers do not bid the value of the property. They bid instead the "amount due" on the property—the delinquent taxes plus fees and accrued interest, in other words—plus a penalty not to exceed 18% assessed every six months. 35 ILCS 200/21–215

(2002). The winning bid is the bid for the "least penalty" amount. *Id.*

Just as the bidders do not bid the value of the property, the winning bidder does not receive the property itself. Once the winner pays the amount due, 35 ILCS 200/21–240 (2002), he receives a "certificate of purchase," 35 ILCS 200/21–250 (2002), entitling him either to reimbursement of the amount paid (plus the "penalty" from the auction) or to a deed, *McKeever*, 132 B.R. at 1006.

The tax sale, then, does not confer title. Rather, it "shifts" the county's lien for the taxes to the tax purchaser. IICLE, *supra*, § 5.29 at 5–28; *see also id.*, § 5.8 at 5–11 (tax sale "shifts the *in rem* lien of the taxes from the county to the tax purchaser"); *In re Application of Cook County Treasurer*, 185 Ill.App.3d 701, 703, 134 Ill. Dec. 15, 542 N.E.2d 15, 16 (1st Dist.1989); *City of Chicago v. City Realty Exchange, Inc.*, 127 Ill.App.2d 185, 190, 262 N.E.2d 230, 233 (1st Dist.1970) (same).[3] In essence, the tax purchaser steps into the shoes of the county after the tax sale, entitled to receive either payment or the property.

The tax purchaser, however, is not entitled to enforce its lien immediately. After the tax sale, the owner, and anyone else with an interest in the property, has an opportunity to redeem the property, 35 ILCS 200/21–345 (2002), an opportunity of which the tax purchaser must give the owner notice, 35 ILCS 200/22–5 (2002).[4]

---

**3.** In *Jackson v. Midwest Partnership*, 176 B.R. 156, 158 (N.D.Ill.1994), the court concluded that a certificate of purchase is actually "more than a lien" and "represents the purchase of an *in rem* judgment." Other courts disagree, *see, e.g., In re Halas*, 194 B.R. 605, 613 (Bankr.N.D.Ill.1996) (declaring that *Jackson* "should not be followed"); *In re Stewart*, 190 B.R. 846, 854 (Bankr.C.D.Ill.1996) (declining to follow *Jackson*), and the view in *Jackson* is not generally accepted.

**4.** To redeem the property, the owner must pay the "certificate amount" (the amount the tax purchaser paid at the sale); any subsequent taxes the tax purchaser paid on the property (since a tax purchaser must also pay subsequent taxes for a tax deed to issue, *see* 35 ILCS 200/22–40(a) (2002)); the penalty previously determined at the auction; and assorted fees. 35 ILCS 200/21–355 (2002). Most residential property can be redeemed

If no redemption takes place, the tax purchaser still does not automatically receive a deed. Shortly before the end of the redemption period, the tax purchaser must petition the state court for an order directing the county clerk to issue a tax deed. 35 ILCS 200/22–30 (2002). The tax purchaser must also give notice to the property owner both that the petition has been filed and that the redemption period is about to expire, 35 ILCS 200/22–10 (2002). When the redemption period has run, the state court will hold a hearing on the petition at which the court will consider whether all statutory requirements have been met. 35 ILCS 200/22–40 (2002). If so, the court will order a tax deed to be issued to the purchaser, *id.,* giving the tax purchaser incontestable, merchantable title to the property, 35 ILCS 200/22–45, 22–55 (2002). The tax purchaser must obtain the deed and record it within one year after the redemption period expires, or the deed, the certificate and the sale itself are deemed void. 35 ILCS 200/22–85 (2002).

### c. The Bankruptcy

On September 16, 2002, the debtors still having failed to redeem the property, NIC duly filed its petition for tax deed in state court under section 22–30 of the Property Tax Code. On October 24, 2002, NIC gave the statutorily required notice to the debtors that the redemption period would expire on February 14, 2003.[5]

Presumably prompted by the notice, on October 30, 2002 the debtors filed their petition for relief under chapter 13 of the Bankruptcy Code and their proposed chapter 13 plan. Schedule D of the petition listed NIC as a secured creditor in the bankruptcy with a claim for "back real estate taxes on rental property."

NIC, however, did not learn of the bankruptcy immediately. The bankruptcy petition mistakenly listed the address of the Cook County Collector as NIC's address, and the petition was therefore not served on NIC. Because the petition gave an incorrect address for NIC and the clerk of the court relies on the petition, NIC also did not receive the court's subsequent notice setting the date for the meeting of creditors.

NIC first gained notice of the bankruptcy roughly nine days before the plan was confirmed. On January 8, 2003, the debtors filed a proof of claim on NIC's behalf listing a secured claim of $3,657.31.[6] The same day the proof of claim was filed, the debtors also filed an amended plan listing NIC as a secured creditor with a claim of $3,659.31 (plus interest) to be paid by the trustee. NIC was served with the proof of claim and amended plan by mail at its correct address—but did nothing.[7] On

for two years and six months after the date of sale, 35 ILCS 200/21–350 (2002), but the tax purchaser can extend the redemption period to as much as three years, 35 ILCS 200/21–385 (2002).

5. The February 14, 2003 expiration date is more than two years and six months from the April 26, 2000 date of sale, *see* 35 ILCS 200/21–350 (2002), and is even beyond the 60–day extension under section 108(b) of the Bankruptcy Code, 11 U.S.C. § 108(b). NIC may have exercised its option under section 21–385 of the Property Tax Code to extend the date. Regardless, the parties agree that

the redemption period expired on February 14, 2003.

6. NIC not only paid the debtors' 1998 property taxes on the Chicago rental property, it also paid the taxes for 1999, 2000, and 2001.

7. Filing the proof of claim was needless. Assuming NIC was a creditor with a secured claim, the debtors could have scheduled the claim to be paid in their plan and had the plan confirmed even if no proof of claim had ever been filed. The proof of claim matters here only because it shows that NIC had notice of the bankruptcy, as well as notice that the debtors intended to treat NIC as a

January 14, 2003, the debtors filed and served on NIC a second amended plan. The second amended plan likewise listed NIC as a secured creditor whose claim would be paid by the trustee. Again, NIC did nothing.

Although NIC had notice of the bankruptcy as well as notice of the proposed treatment of its claim in the debtors' chapter 13 plan, NIC did not file an objection to the confirmation of either the amended or second amended plan. On January 17, 2003, the court confirmed the second amended plan. Shortly after confirmation, the standing chapter 13 trustee began to pay NIC in accordance with the plan, sending NIC a check. Viewing the payment as an improper attempt to redeem the 1998 taxes, NIC simply returned the check with a letter stating that it was "not authorized to accept redemption monies."

NIC took no action at all in the bankruptcy for three and a half months after confirmation of the plan. Then NIC stirred itself at last. In May 2003, NIC filed a motion in this court seeking relief from the stay to permit NIC to continue with the tax deed proceeding it had begun in state court the preceding September.

### 3. Analysis

#### a. NIC Is a "Creditor" in the Bankruptcy

NIC stakes its entire case on a single argument: that the automatic stay should be modified because NIC was never a "creditor" with a "claim" in the bankruptcy. Therefore, NIC maintains, it was never subject to the stay in the first place.[8] Citing *Bates,* 270 B.R. at 461, the debtors respond that NIC was and is a "creditor."

The debtors have the better of the argument. The Bankruptcy Code defines a "creditor" as an "entity that has a claim against the debtor that arose before the order for relief concerning the debtor." 11 U.S.C. § 101(10). A "claim," in turn, is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, or unsecured," 11 U.S.C. § 101(5)(A), or as a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment," 11 U.S.C. § 101(5)(B).

So far, so good, even NIC would admit. But a creditor, NIC asserts, is "an entity that can show that the debtor owes or potentially owes payment to it." (NIC Reply at 3). NIC insists that it has no "right to payment" from the debtors (or any equitable remedy against them) and never had.

 NIC is mistaken. The Code's definition of claim is "expansive." *Pennsylvania Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). In section 101(5), Congress adopted "the broadest available definition of 'claim,'" *Johnson v. Home St. Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), contemplating that "all legal obligations of the debtor ... will be able to be dealt with in the bankruptcy case," *Pennsylvania Dep't of Pub. Welfare,* 495 U.S. at 558, 110 S.Ct. 2126 (internal quotation omitted); *see also In re Knight,* 55 F.3d 231, 234 (7th Cir.1995). "Right to payment" thus means "nothing more nor less than an enforceable obligation."

---

secured creditor and pay the secured claim under the plan.

**8.** NIC's steadfast adherence to the notion that it is not a creditor in the bankruptcy probably explains why NIC permitted a proof of claim

to be filed on its behalf, why NIC never objected to confirmation, and why NIC returned the standing trustee's payment under the plan.

*Pennsylvania Dep't of Pub. Welfare*, 495 U.S. at 559, 110 S.Ct. 2126.

■ Among those obligations is one enforceable solely against the debtor's property—an *in rem* right. Section 102(2) makes clear that a "claim against the debtor" includes a "claim against the property of the debtor." 11 U.S.C. § 102(2). Citing section 102(2), and noting the Code's broad definition of "claim," the Court in *Johnson* held that a mortgage holder had a "claim" against the debtor-mortgagor even though the debtor's personal liability on the debt had been discharged in an earlier bankruptcy. *Johnson*, 501 U.S. at 84, 111 S.Ct. 2150. The Court reasoned that the mortgagee still had a "right to payment" consisting of "its right to the proceeds from the sale of the debtor's property." *Id.* Alternatively, the mortgagee's right to foreclose could be viewed as a "right to an equitable remedy" for the default. *Id.* Either way, the Court said, the mortgagee had a "claim," because a "creditor who has a claim enforceable only against the debtor's property nonetheless has a 'claim against the debtor' for purposes of the Code." *Id.* at 86, 111 S.Ct. 2150 (quoting section 102(2)).

■ A tax purchaser like NIC has a claim enforceable against the debtor's property. By paying the delinquent taxes, a tax purchaser obtains a lien on the property. IICLE, *supra*, §§ 5.29 at 5–28, 5.8 at 5–11; *In re Milne*, 185 B.R. 277, 279 (Bankr.N.D.Ill.1995); *In re Casper*, 156 B.R. 794, 799 (Bankr.S.D.Ill.1993); *In re Wells Properties, Inc.*, 102 B.R. 685, 690 (Bankr.N.D.Ill.1989); *Cook County Treasurer*, 185 Ill.App.3d at 703, 134 Ill.Dec. 15, 542 N.E.2d at 16; *City Realty Exchange*, 127 Ill.App.2d at 190, 262 N.E.2d at 233. The lien entitles the tax purchaser either to repayment if the property is redeemed, IICLE, *supra*, § 5.65 at 5–72, or, if the property is not redeemed, to the property

itself, 35 ILCS 200/22–40 (2002); *see In re Halas*, 194 B.R. at 613.

The tax purchaser's enforceable right to obtain the property by way of a tax deed if no redemption takes place is, of course, an *in rem* right. Possession of an *in rem* right against property owned by a debtor in a bankruptcy case gives the tax purchaser a "claim" in the bankruptcy. *Johnson*, 501 U.S. at 86, 111 S.Ct. 2150. The tax purchaser is therefore a "creditor" in the bankruptcy. *In re Murray*, 276 B.R. 869, 875 (Bankr.N.D.Ill.2002) (finding tax purchaser's *in rem* right rendered tax purchaser a "creditor"); *In re Davenport*, 268 B.R. 159, 166–67 (Bankr.N.D.Ill.2001) (same).

In defense of its position, NIC depends primarily on the Illinois Supreme Court's decision in *A.P. Properties, Inc. v. Goshinsky*, 186 Ill.2d 524, 239 Ill.Dec. 600, 714 N.E.2d 519 (1999), in which the court held that for purposes of the Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.*, no "debtor/creditor relationship" exists between a tax purchaser and a property owner. *Goshinsky*, 186 Ill.2d at 530, 239 Ill. Dec. 600, 714 N.E.2d at 522. NIC calls *Goshinsky* "dispositive." (NIC Reply at 2).

■ It is not. First, decisions of state courts are never dispositive on issues of federal law, *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir.1997), any more than federal decisions are on matters of state law, *see, e.g., Cooper v. Illinois St. Univ.*, 331 Ill.App.3d 1094, 1100, 265 Ill.Dec. 358, 772 N.E.2d 396, 400 (4th Dist.2002) (ignoring the misinterpretation of Illinois state court jurisdiction in *Erickson v. Board of Governors*, 207 F.3d 945 (7th Cir.2000)). Where federal law is concerned, state court decisions are at best "only persuasive authority." *RAR*, 107 F.3d at 1276.

Second, *Goshinsky* did not address any question of federal law, much less one under the Bankruptcy Code. *Goshinsky* concerned the meaning of "claim" in the Uniform Fraudulent Transfer Act, a state statute. *Goshinsky*, 186 Ill.2d at 528–30, 239 Ill.Dec. 600, 714 N.E.2d at 521–22. Although the definitions of "claim" in the Act and the Code are similar, the Code (unlike the Act) encompasses more than just "claims" arising out a "traditional creditor-debtor relationship." *Pennsylvania Dep't of Pub. Welfare*, 495 U.S. at 558, 110 S.Ct. 2126. *Goshinsky* is dispositive of the state law question the Illinois Supreme Court decided. But it is no help to NIC here. *See Bates*, 270 B.R. at 463 n. 4 (finding *Goshinsky* neither binding nor relevant); *Davenport*, 268 B.R. at 167 (declining to "misapply" *Goshinsky* to "disregard . . . the Code's definitions").

NIC also cites *In re Blue*, 247 B.R. 748 (Bankr.N.D.Ill.2000), apparently the only published decision finding an Illinois tax purchaser not to be a "creditor" under the Bankruptcy Code. *Blue* arrived at this result by construing "claim" (and therefore "right to payment") narrowly, distinguishing *Johnson* on the ground that the case "involved a mortgage, not a tax sale." *Blue*, 247 B.R. at 753. A mortgage, *Blue* said, secures a "right to repayment," *id.* (internal quotation omitted); a tax purchaser never has such a right and "cannot compel [the property owner] to pay it money," *id.*

*Blue* viewed the tax purchaser's position too restrictively. A party becomes a tax purchaser in the first place by paying the property owner's tax obligation to the county. In doing so, the tax purchaser for all intents and purposes takes over the county's position, becoming the holder of the county's lien on the property. *See* IICLE, *supra*, § 5.29 at 5–28; *see also id.*, § 5.8 at 5–11 (tax sale "shifts the *in rem*

lien of the taxes from the county to the tax purchaser"). As lien-holder, the tax purchaser is entitled, on compliance with statutory requirements, either to repayment if the property is redeemed, IICLE, *supra*, § 5.65 at 5–72, or to the property itself if it is not, 35 ILCS 200/22–40 (2002).

True enough, the tax purchaser's right after a redemption is to repayment by the county, not to repayment by the property owner redeeming the property. But the county pays the tax purchaser only if the owner pays the county first. And because the taxes owed the county have already been paid, the county ends up no better off. In a redemption, in other words, the county serves only as a conduit for the funds. It would "exalt form over substance" to consider the transaction anything other than one where monies flow from the owner to the tax purchaser "channeled through" the county. *See Davenport*, 268 B.R. at 167.

As a matter of economic reality, then, the tax purchaser's *in rem* right does secure repayment: if the owner does not redeem the property (and so if the tax purchaser is not repaid), the tax purchaser is entitled to seek a tax deed in state court. As with a nonrecourse mortgage, "the consequence of nonpayment is loss of the landowner's property." *Bates*, 270 B.R. at 464. That consequence ensures repayment just as much whether the party to be paid is a tax purchaser or a nonrecourse mortgagee. *Id.* at 463–64. Like the court in *Bates*, this court declines to follow *Blue*.

Because NIC has a right against the debtors' property, NIC has a "claim" against the debtors and is a "creditor" in their bankruptcy.

#### b. NIC Is Bound by the Confirmed Plan

■ With the "claim" question out of the way, the next question would ordinarily be how NIC's claim can be treated in

the debtors' chapter 13 case. On this subject, as well, the decisions are split. *Bates* declares in *dictum* that a tax purchaser's claim can be paid in installments through a chapter 13 plan as long as the redemption period did not expire before the bankruptcy was filed. *See Bates,* 270 B.R. at 466–67. *Murray* disagrees, holding that a tax purchaser's claim cannot be treated in a plan but must be paid in full before the redemption period expires. *See Murray,* 276 B.R. at 875–76; *see also Stewart,* 190 B.R. at 850–51 (adopting this position).

This case, unfortunately, offers no opportunity to take sides in the debate. The debtors filed a proof of claim on NIC's behalf describing NIC's claim as secured; tendered multiple plans proposing to pay NIC's claim; and had the court confirm a plan doing just that. All of this occurred with notice to NIC. NIC was served with the proof of claim. NIC was also served with the amended and second amended plans. Despite knowledge of the bankruptcy and how the debtors were proposing to treat NIC's claim, NIC never objected to plan confirmation, and the debtors' second amended plan was accordingly confirmed.

■ NIC is bound by the confirmed plan. Under section 1327(a), "[t]he provisions of a confirmed plan bind the debtor and each creditor whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, accepted, or has rejected the plan." 11 U.S.C. § 1327(a). It is therefore well-established "that a party with adequate notice of a bankruptcy proceeding cannot ordinarily attack a confirmed plan." *In re Harvey,* 213 F.3d 318, 321 (7th Cir.2000); *see also Adair v. Sherman,* 230 F.3d 890, 894 (7th Cir.2000) (stating that "once a bankruptcy plan is confirmed, its terms are not subject to collateral attack"); *In re Chappell,* 984 F.2d 775, 782 (7th Cir.1993); *In re Pence,* 905 F.2d 1107, 1109–10 (7th Cir.1990).

■ Because plan confirmations are final and appealable orders, *see In re Wade,* 991 F.2d 402, 406 (7th Cir.1993), the bar to collateral attacks on confirmed plans is no more than *res judicata* principles at work, *In re Puckett,* 193 B.R. 842, 845 (Bankr.N.D.Ill.1996). As the court in *Harvey* explained, these principles have particular force in bankruptcy: "Bringing the various creditors' interests to the table once is difficult enough; permitting one of the creditors to launch a later attack on a confirmed plan would destroy the balance of interests created in the initial proceedings." *Harvey,* 213 F.3d at 321.

Having failed to object to the debtors' plan before confirmation despite notice of the bankruptcy and the plan, NIC is barred from using its motion to modify the stay to do so now.[9] *See* 3 K. Lundin, *Chapter 13 Bankruptcy* § 229.1 at 229–24 (3rd ed.2002) (creditor who fails to object to or appeal confirmation may not use "a postconfirmation motion for relief from the stay to collaterally attack the confirmed plan"); *see also Davenport,* 268 B.R. at 167 (noting in *dictum* the possibility that

---

9. Citing *Colon v. Option One Mortgage Corp.,* 319 F.3d 912 (7th Cir.2003), NIC argues that the debtors had to redeem the property from the tax sale during the redemption period and failed to do so. That, NIC asserts, should be the end of the matter: the Bankruptcy Code "does not create a more expansive right to redeem" than state law. (NIC Reply at 5). Perhaps not. But the debtors in their plan are not "redeeming" the property. They are paying NIC's secured claim. More important, if NIC wanted to argue that a debtor may not pay such a claim under a chapter 13 plan—advancing the position *Murray* takes—NIC had to do so by objecting to confirmation. It is too late to make the argument now.

under section 1327(a) a tax purchaser seeking to modify the stay might be bound by a property owner's "confirmed plan of which it had notice").

It is important to note, finally, that NIC has never complained that it lacked notice of the debtors' bankruptcy. Plainly, NIC did have notice.[10] NIC elected instead to stand on the principle that as a tax purchaser it was not a "creditor" with a "claim" in the bankruptcy and so could ignore the bankruptcy proceedings with impunity. But principles can prove expensive, as this case illustrates. NIC chose to let the debtors' plan treating its claim be confirmed without objection. NIC "must live with its procedural choice." *Pence,* 905 F.2d at 1107.

### 4. Conclusion

The motion of National Indemnity Corporation to modify the automatic stay is denied.

---

**10.** Had NIC received no notice of the bankruptcy this would be a different case. NIC would then have a valid complaint that it had been denied due process and so would have a legitimate post-confirmation basis for attacking the plan. *See Pence,* 905 F.2d at 1109; *Puckett,* 193 B.R. at 848. But although NIC did not receive much in the way of notice, the notice NIC did receive was sufficient. Before the debtors' second amended plan was confirmed, the proof of claim and amended plan apprised NIC that the bankruptcy was pending and would involve its claim. Due process required no more. *Pence,* 905 F.2d at 1109. Sophisticated creditors—including institutional tax purchasers—who learn of a bankruptcy proceeding have an obligation to follow its administration "to determine what aspects of the proceeding they may want to challenge." *Id.* Once notified, NIC could not "stick its head in the sand and pretend it would not lose any rights by not participating in the proceeding." *Id.*