[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17467
_____

D.C. Docket No. 4:16-cv-00172-CDL,
Bkcy No. 4:15-bkc-40877-JTL

In re: JONATHAN NORTHINGTON,

Debtor.

_____

TITLE MAX,

Plaintiff-Appellant,

versus

JONATHAN NORTHINGTON,

Defendant- Appellee.

_____

No. 16-17468
_____

D.C. Docket No. 4:16-cv-00174-CDL,
Bkcy No. 4:15-bkc-40962-JTL

In re: GUSTAVIUS A. WILBER,

Debtor.

_____

TITLE MAX,

                                                    Plaintiff-Appellant,

                              versus

GUSTAVIUS A. WILBER,

                                                    Defendant- Appellee.

_____

Appeals from the United States District Court
for the Middle District of Georgia
_____

(December 11, 2017)

Before WILSON and NEWSOM, Circuit Judges and MORENO,[*] District Judge.

NEWSOM, Circuit Judge:

This case requires us to assess the interplay between the United States Bankruptcy Code and a Georgia statute that defines state-law property rights. For its part, the Code describes a bankruptcy estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), and goes on to provide, as relevant here, that a Chapter 13 plan can "modify the rights of holders of secured claims" on property in the estate, *id*. § 1322(b)(2). Meanwhile, Georgia's "pawn" law states that any "pledged"—*i.e.*, pawned—item that is not "redeemed" within a statutorily prescribed grace period

_____

[*] Honorable Federico A. Moreno, United States District Court Judge for the Southern District of Florida, sitting by designation.

2

"shall be automatically forfeited to the pawnbroker by operation of [law], and any ownership interest of the pledgor … shall be automatically extinguished in the pledged item."  Ga. Code Ann. § 44-14-403(b)(3).

So how do these provisions interact?  Very briefly, here's the deal:  The debtor in this case entered into a pawn transaction in which he pledged his car in exchange for a loan, defaulted on the loan by failing to repay it on time, and then, shortly before the expiration of the redemption period—during which he could pay off his debt (with interest) and thereby regain title to his car—filed a Chapter 13 bankruptcy petition.  Even though the Bankruptcy Code extended the debtor's state-law grace period an additional 60 days, he still failed to redeem the car.  All agree that because the debtor filed for bankruptcy before the grace period lapsed, the car and the associated right of redemption initially became part of the bankruptcy estate pursuant to Section 541(a)(1).  But this case presents the following interesting question:  Did the filing of the bankruptcy petition necessarily freeze those assets in the estate just as they were, such that at confirmation the pawnbroker remained a mere "holder[] of [a] secured claim" whose "rights" the bankruptcy court could "modify" under Section 1322(b)(2)— here, by extending the repayment schedule?  Or instead, even after the petition's filing, did Georgia's pawn statute continue to operate in the background, so to speak, such that upon the expiration of the redemption period, the car was

3

"automatically forfeited to the pawnbroker by operation of [law]" and thus ceased

to be property of the estate, leaving no bankruptcy-based "claim" or "right" to be

"modif[ied]"?

Mindful of the deference owed to state-law definitions and regulations of

property rights—even in this heavily "federal" area of law—we hold that the

Bankruptcy Code did not forestall the "automatic[]" operation of Georgia's pawn

statute, that the car dropped out of the bankruptcy estate (and vested in the

pawnbroker) when the prescribed redemption period lapsed, and, accordingly, that

with respect to the car, Section 1322(b)(2) had no field of operation.  Simply put,

following the expiration of the grace period, the pawnbroker didn't have a mere

"claim" on the debtor's car—it had the car itself.

## I

On September 2, 2015, Gustavius Wilber and TitleMax entered into a pawn

transaction under Georgia law, *see* Ga. Code Ann. § 44-14-403, in which Wilber

exchanged the certificate of title on his 2006 Dodge Charger for a $4,400 cash

advance.[1]  Because pawn transactions are nonrecourse loans, Wilber had no firm

obligation to repay the advance or to redeem the Charger; rather, if Wilber failed to

---

[1] Wilber and Jonathan Northington were debtors in two virtually identical bankruptcy cases.  The district court combined the cases on appeal from the bankruptcy court.  Northington, though, failed to comply with his Chapter 13 plan, and the bankruptcy court therefore dismissed his proceeding.  That dismissal moots TitleMax's appeal against Northington.  *See Neidich v. Salas*, 783 F.3d 1215, 1216 (11th Cir. 2015) ("[T]he dismissal of a Chapter 13 case moots an appeal arising from the debtor's bankruptcy proceedings.").

pay off the loan with interest, TitleMax simply took the car.  *See* Ga. Code Ann. §
44-14-403.  Wilber's pawn transaction matured on October 2, 2015, by which
point he had to repay his loan in order to regain title to his car.

Wilber failed to repay the loan by its maturity date.  Georgia law, though,
gives a defaulting debtor in a motor-vehicle pawn transaction a 30-day grace
period during which he can redeem his car.  *See id*. § 44-14-403(b)(1).  Here, on
October 30, just before his redemption period was set to expire on November 2,
Wilber—still in possession of the Charger[2]—filed a petition for relief under
Chapter 13 of the United States Bankruptcy Code.  Wilber simultaneously filed his
Chapter 13 plan, which listed TitleMax as a creditor holding a secured claim on the
Charger.  Pursuant to 11 U.S.C. § 108(b), the Bankruptcy Code extended Wilber's
state-law grace period an additional 60 days from the date of his petition, giving
him until December 29 to redeem the car.

The extended expiration date came and went with no redemption.  On
January 8, 2016, before the bankruptcy court held a confirmation hearing on
Wilber's proposed plan, TitleMax filed a motion for relief from the Code's
automatic-stay provision, 11 U.S.C. § 362(a), so that it could recover the Charger,
which Wilber still had in his possession.  In the motion, TitleMax contended that

---

[2] Although a pawnbroker has the right to take possession of pledged property during the
redemption period, *see id*. § 44-12-131(a)(3), TitleMax didn't do so here.

5

Wilber's bankruptcy estate no longer included the car because Wilber had failed to redeem it within the extended grace period.

The bankruptcy court conducted confirmation hearings on January 21 and February 2, and then on February 9—with TitleMax's motion for relief from the stay still pending—entered an order confirming Wilber's Chapter 13 plan. The confirmed plan treated TitleMax as a creditor on a $5,036 debt secured by a claim on the Charger, and provided for repayment of the pawn loan at a 5% interest rate in installments of $175 per month.

Following confirmation, the parties continued to litigate TitleMax's earlier-filed motion for relief from the automatic stay, and on April 29, 2016, the bankruptcy court entered a final order denying that motion. Rejecting TitleMax's arguments, the court held (1) that the Charger and the redemption right were property of Wilber's bankruptcy estate, and remained so even after the expiration of the Code-extended grace period, and accordingly (2) that TitleMax didn't own the car itself, but rather continued to hold only a secured "claim" on it, which gave rise to repayment "rights" that could be "modif[ied]" under Section 1322(b)(2). *In re Wilber*, 551 B.R. 542, 544–47 (Bankr. M.D. Ga. 2016). The bankruptcy court separately (and alternatively) concluded that under 11 U.S.C. § 1327(a) and "[t]he doctrine of res judicata," the order confirming Wilber's Chapter 13 plan precluded

6

any relief for TitleMax, which the court said had "slept on its rights by not timely objecting" to confirmation. *Id.* at 547–48.

The district court affirmed the bankruptcy court's decision on the merits, without addressing the "res judicata" issue. In particular, the district court "agree[d] with the bankruptcy court's conclusion" that "because the vehicle[ was] part of the debtor['s] estate[] when the debtor[] filed [his] Chapter 13 petition[], Title Max held [a] secured claim[] in the vehicle[] that could be modified under 11 U.S.C. § 1322(b)(2)." *Title Max v. Northington*, 559 B.R. 542, 545 (M.D. Ga. 2016).

TitleMax timely appealed to this Court, challenging the district court's affirmance of the order denying its motion for relief from the automatic stay. Title Max's appeal presents questions of law, which we review *de novo*. *See In re Paschen*, 296 F.3d 1203, 1205 (11th Cir. 2002) (internal citations omitted).

## II

Before jumping into the merits, we must first address the bankruptcy court's alternative (but logically antecedent) holding that TitleMax's challenge is procedurally barred on "res judicata" grounds.

The bankruptcy court held that TitleMax "slept on its rights" by "fail[ing] to timely object to confirmation" of Wilber's proposed Chapter 13 plan. 551 B.R. at 548. Accordingly, the court held that its confirmation order was conclusive under

7

11 U.S.C. § 1327(a)—which generally binds a debtor and his creditors to the terms of a confirmed plan—and "[t]he doctrine of res judicata."  551 B.R. at 548.

In the particular circumstances of this case, we cannot agree that TitleMax impermissibly "slept on its rights" and thus forfeited its ability to raise the argument that it presents on appeal.  The decision that the bankruptcy court cited for support, *In re Young*, 281 B.R. 74 (Bankr. S.D. Ala. 2001), provides a useful (and stark) contrast.  As in this case, the debtor in *Young* failed to redeem property that it had pledged to a pawnbroker.  And as in this case, the bankruptcy court held a hearing on the debtor's proposed Chapter 13 plan—which listed the pawnbroker as the creditor on the pawn debt—and later entered an order confirming the plan. The pawnbroker in *Young*, however, did absolutely nothing to preserve its argument that it had rightful title to the pawned property.  It didn't "participate in the confirmation [hearing]," nor did it in any way contest the plan's consummation; rather, following confirmation, the pawnbroker simply set out, unilaterally, to sell the pawned property, prompting the debtor to file a motion to enforce the automatic stay.  *See id*. at 76, 80.

Here, by contrast, even before the bankruptcy court held a confirmation hearing, and thus by definition before it entered any confirmation order, TitleMax filed a written motion in which it contended—just as it does here—that at the moment Wilber failed to redeem the Charger pursuant to Georgia's pawn statute,

8

the car ceased to be property of the bankruptcy estate. TitleMax then appeared at the hearing, and later filed post-hearing briefs, to reiterate its position. When the bankruptcy court later denied its motion for relief from the automatic stay, thereby bringing the bankruptcy proceeding to a close, TitleMax appealed directly to the district court and then, following that court's affirmance, directly to this Court.

Our dissenting colleague, who would affirm on res-judicata grounds, is of course quite right to say that TitleMax had "to take some action" in order to preserve its position that the car dropped out of the estate upon the expiration of the redemption period. Dissenting Op. at 30 n.2. The question is precisely what form that "action" had to take. The dissent repeatedly protests that TitleMax didn't formally "object" to the confirmation of Wilber's Chapter 13 plan. *See, e.g.*, Dissenting Op. at 29, 30, 31, 32, 33, 36, 37, 38, 39. That's true—no one denies it, and TitleMax freely admits it.[3] We hold, though, that on the unique facts of this case, TitleMax was not required to file an "Objection"—styled as such—but rather adequately preserved its position through its pre-confirmation motion for relief from the automatic stay, which it briefed and argued to the bankruptcy court.

First, as a practical matter, there is no substantive difference between the styled-as-such "Objection" that the dissent would seemingly require and the

---

[3] That being the case, the entirety of Part I of the dissenting opinion—urging that "[w]hether a party made an objection is a factual finding subject to clear error review" and that the bankruptcy court here "specifically found" that TitleMax failed to formally "object" to confirmation—is beside the point. Dissenting Op. at 30–33.

9

motion for relief that TitleMax actually filed.  As Wilber's counsel candidly acknowledged at oral argument, "the body of [TitleMax's motion] was exactly what they needed for an objection to confirmation."  Oral Arg. Tr. at 20:38.  "They could've changed the title" of the pleading, he said, "and not had to change anything else other than the request for the relief."  *Id*.  The parties thus agree that TitleMax put the *substance* of its position—namely, that the Charger ceased to be estate property when the redemption period lapsed—squarely before the bankruptcy court.[4]

Second, as a legal matter, in the circumstances presented here, TitleMax didn't need to file a styled-as-such "Objection" in order to preserve its position that the Charger ceased to be estate property upon the expiration of the redemption period; rather, that argument was adequately teed up (just as TitleMax presented it) in a motion for relief from the stay.  *Cf. In re Boyd*, 11 F.3d 59, 60 (5th Cir. 1994) (holding that even where a Chapter 13 plan was confirmed without a formal objection, a creditor's motion for relief from the stay adequately preserved its argument that disputed property was not properly part of the bankruptcy estate).[5]

---

[4] Accordingly, to the extent that TitleMax's lawyers have contended from time to time that, practically speaking, their motion for relief from the stay was tantamount to a more formal "Objection," *see* Dissenting Op. at 30 n.2, 36–37, they have good company in Wilber's own counsel.

[5] Although *Boyd* isn't quite on point—there, the debtor's state-law redemption period expired before he filed his Chapter 13 petition, and, accordingly, the disputed property "was never part of [the] bankruptcy estate," 11 F.3d at 60—its logic nonetheless applies.  As explained in detail below, TitleMax contends that by the time Wilber's plan was confirmed, the Charger had

TitleMax filed its motion pre-confirmation, making exactly the same argument and seeking exactly the same relief that it does here. When the bankruptcy court rejected its argument and denied its motion, TitleMax took an appeal directly to the district court and then, following that court's affirmance, came straight to this Court.[6]

We hold that in the particular (and peculiar) factual and procedural posture in which this case arises, TitleMax did enough to preserve its position. We turn, then, to an evaluation of the merits.

## III

The district court explained its decision on the merits in two parts. Initially, the court observed, "when [Wilber] filed [his] Chapter 13 petition[], the vehicle[ was] part of [his] bankruptcy estate[] and Title Max held [a] secured claim[]" in it. 559 B.R. at 546. Accordingly, the court concluded, because the Bankruptcy Code provides in 11 U.S.C. § 1322(b)(2) that "a Chapter 13 plan may 'modify the rights

___

dropped out of the estate by the "automatic[]" operation of Georgia's pawn statute. Accordingly, at the pertinent moment of confirmation—by which point TitleMax had clearly asserted its position in its motion for relief from the stay—the creditors in *Boyd* and this case were identically situated.

[6] Far, then, from the collateral "post-confirmation challenge" that the dissent posits, *see* Dissenting Op. at 34, 38, TitleMax has prosecuted a garden-variety direct appeal from a final order denying its requested relief. The dissent's reliance on *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) (disallowing a years-after-the-fact collateral attack on a confirmed plan under Rule 60), and *Hope v. Acorn Fin., Inc*., 731 F.3d 1189 (11th Cir. 2013) (disallowing a stand-alone "post-confirmation avoidance action"), is thus misplaced.

of holders of secured claims' … the bankruptcy court was authorized to modify Title Max's claim[] as it did …." *Id.* The district court skipped an important step—a mistake that our dissenting colleague largely repeats—and it is that step on which this appeal largely turns.

In order to hold (as the district court did) that Wilber's Chapter 13 plan could modify TitleMax's rights, it would be necessary not only to conclude (as the district court did) that the Charger initially became part of Wilber's bankruptcy estate with the filing of his petition, but also to find (as the district court did *not*) that it remained in the estate even after the expiration of the prescribed redemption period. We agree with the district court that the Charger entered Wilber's estate, but we hold that it dropped out—pursuant to the "automatic[]" operation of Georgia's pawn statute—when the grace period lapsed.

## A

We can make quick work of the first issue. Section 541 of the Bankruptcy Code specifies the property interests that constitute the bankruptcy estate. 11 U.S.C. § 541. In relevant part, Section 541 states that a debtor's estate comprises "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.* at (a)(1). As used in Section 541(a)(1), the term "commencement" means the date on which the debtor filed his bankruptcy petition. *See* 5 *Collier on Bankruptcy* ¶ 541.02 (16th ed. 2017).

12

TitleMax concedes, and the parties thus agree, that "on October 30, 2015—the date he filed his bankruptcy petition—Wilber retained property interests in the Charger that became 'property of the estate' under 11 U.S.C. § 541."  Br. of Appellant at 10.  In particular, the parties agree that the car, which remained in Wilber's possession, as well as the associated right to redeem it—which at that time had not yet expired—entered the estate with the filing of his petition.  *Id*. at 8 (referring to the "right to possess" and the "right to redeem" as "property interests related to the Charger that … entered the bankruptcy estate").

That all seems right to us.  The Supreme Court has observed that "§ 541(a)(1)'s scope is broad," *United States v. Whiting Pools*, 462 U.S. 198, 204 (1983), and existing precedent supports the parties' shared view that both the Charger and the right of redemption became estate assets upon the filing of Wilber's bankruptcy petition.  *See In re Lewis*, 137 F.3d 1280, 1284 (11th Cir. 1998) (stating that a debtor's "statutory right of redemption in the automobile became 'property of the estate' under 11 U.S.C. § 541(a)(1) at the commencement of the case"); *In re Moore*, 448 B.R. 93, 100 (Bankr. N.D. Ga. 2011) (finding that debtors' vehicles entered the estate where, as here, the debtors "had possession of the pawned vehicles at the time of the bankruptcy filing and the grace periods for their redemptions had not yet expired").

13

But—and it's a big but—contrary to the district court's (implicit) determination, finding that the car and the redemption right were initially made part of Wilber's bankruptcy estate doesn't end the inquiry. The controlling question isn't whether Wilber's property interests in the Charger entered the bankruptcy estate in the first instance—they did—but rather whether, despite the expiration of the prescribed grace period, those assets *remained* in the estate at the time of confirmation, such that TitleMax's rights in them could be "modif[ied]" under Section 1322(b)(2). That is the issue to which we now turn.

## B

The parties have clearly joined issue on the question whether an asset that is initially made part of a bankruptcy estate must necessarily remain there, irrespective of the underlying state law that defines it—or whether, instead, the ordinary operation of that state law can (for reasons wholly separate from the bankruptcy) cause the asset to drop out of the estate. For its part, TitleMax insists that "[n]o principle of bankruptcy law requires that a debtor's bankruptcy estate be frozen in time where a debtor's state-law interest in property is divested after the date of filing." Br. of Appellant at 10. Wilber rejoins, precisely to the contrary, that "it is clear that the estate is in fact 'frozen in time' as of the filing of the case." Br. of Appellee at 5. The battle lines thus clearly drawn, we must decide whether the filing of a bankruptcy petition necessarily freezes the debtor's estate and

14

thereby forestalls the operation of the state-law rules that define and regulate the property interests that comprise that estate.

1

In assessing this question, we begin with an important stage-setting observation:  Even in the uniquely "federal" bankruptcy context, "[p]roperty interests are created and defined by state law."  *Butner v. United States*, 440 U.S. 48, 55 (1979); *accord, e.g.*, *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) (observing that, as a general matter, "'property' and 'interests in property' are creatures of state law").  Particularly significant for present purposes, this Court has emphasized that although "whether an interest of the debtor[] is property of the estate is a federal question," "the nature and existence of the debtor['s] right to property is determined by looking to state law."  *In re Thomas*, 883 F.2d 991, 995 (11th Cir. 1989).

Accordingly, analyzing a bankruptcy estate requires two tiers of inquiry, first into the assets of the estate, and then into the underlying property rights and interests that constitute each asset—first, that is, into the estate's contents, and then into the contents of the contents.  The second, more granular inquiry—into the nature of a debtor's property interest in a particular estate asset—turns on state law.  *See Butner*, 440 U.S. at 54 ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."); *In re Smith*, 85

15

F.3d 1555, 1557 (11th Cir. 1996) ("The property rights of a debtor in a bankruptcy estate are defined by state law."); *Norton Bankruptcy Law and Practice* § 61.3 (3d ed. 2016) ("State law determines the existence, nature, and extent of any property interests a debtor may have.").

With respect to the particular estate asset at issue here—Wilber's pawned Charger—the applicable state law is crystal clear:  Under Georgia's pawn statute, "[p]ledged goods not redeemed within the grace period shall be *automatically* forfeited to the pawnbroker . . . and any ownership interest of the pledgor or seller shall *automatically* be extinguished as regards the pledged item."  Ga. Code Ann. § 44-14-403(b)(3) (emphasis added).  All agree that under Section 44-14-403(b)(3)'s plain terms, the expiration of the redemption period is conclusive—the debtor loses title to his pawned property, which vests immediately and by operation of law in the pawnbroker.  Indeed, at oral argument, Wilber's counsel acknowledged that but for the bankruptcy "stepp[ing] in," TitleMax "would have had th[e] car" and Wilber would have had "no recourse."  Oral Arg. Tr. at 24:50.  The question presented here is whether federal bankruptcy law changes all that, prevents the ordinary and "automatic" operation of Georgia's pawn statute, and prohibits title to the Charger from passing, as it otherwise would, from Wilber to TitleMax.[7]

---

[7] In this respect, Georgia's pawn statute seems to operate pretty much the same way that all state pawn laws operate—and, so far as we can tell, pretty much the same way that pawn laws have always been understood to operate.  *See, e.g.*, Ala. Code §5-19A-6 ("Pledged goods not

16

To be clear, we are not concerned here with congressional power; Congress has extensive authority in the bankruptcy arena—including the authority to supersede state property law.  *See* U.S. Const. Art. I, § 8, cl. 4.  Rather, the issue before us is whether Congress has in fact exercised that authority.  In answering that question, we take our cue from the Supreme Court's decision in *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994).  There, the Court considered the meaning of Section 548 of the Bankruptcy Code, which empowers a bankruptcy trustee to set aside "constructively fraudulent transfers," including an insolvent debtor's sale of property, within one year before filing bankruptcy, for less than "reasonably equivalent value."  11 U.S.C. § 548(a)(2).  The particular issue before the Court in *BFP* was whether the term "reasonably equivalent value" should be read to imply a "fair market value" benchmark—or whether, instead, the statutory term should be understood by reference to the underlying state law, such that the price fetched at a foreclosure sale conducted in accordance with applicable state

---

redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker."); Fla. Stat. Ann. § 539.001(10) ("Pledged goods not redeemed within the 30-day period following the maturity date of a pawn are automatically forfeited to the pawnbroker; absolute right, title, and interest in and to the goods shall vest in and shall be deemed conveyed to the pawnbroker by operation of law; and no further notice is necessary."); 47 C.J.S. *Interest & Usury* § 577 ("[I]n a typical pawn, a debtor deposits goods with the pawnbroker and receives money in return, and if the customer does not "redeem" the pawn within a specified time, the power to sell the goods deposited automatically passes to the pawnbroker …."); 2 W. Blackstone, *Commentaries* *396 (observing that "goods pledged or pawned," like other property interests giving rise to "qualified" rights, "may be redeemed, or else forfeited").

17

procedures would conclusively establish the property's "reasonably equivalent value."  In opting for the latter rule, the Court made several observations that guide our analysis here.

First, the Supreme Court explained that "[a]bsent a clear statutory requirement to the contrary," courts interpreting the Bankruptcy Code "must assume the validity of th[e] state-law regulatory background" at issue "and take due account of its effect."  511 U.S. at 539.  In *BFP*, the underlying state law was one that permitted a mortgagee to unload property at a forced sale, and that law's "effect" was that "property that *must* be sold within those strictures is simply *worth less*" than it would be on the open market.  *Id*. (emphasis in original).  Here, the Georgia pawn statute's "effect" is that following expiration of the prescribed redemption period, a debtor's rights in the pledged property are "automatically forfeited," "extinguished," and vested in the pawnbroker.

Second, and relatedly, the *BFP* Court emphasized that before a federal statute—notably including the Bankruptcy Code—may be read to "displace traditional state regulation," the "federal statutory purpose must be 'clear and manifest.'"  *Id*. at 544 (quoting *English v. General Elec. Co*., 496 U.S. 72, 79 (1990)).  Significantly for present purposes, just as the states have historically regulated the sorts of mortgage-foreclosure transactions at issue in *BFP*, *see id*. at 540-43, they have long regulated pawn transactions, *see, e.g*., *Lockwood v.*

18

*Muhlburg*, 124 Ga. 660 (Ga. 1906); *cf. also Asakura v. City of Seattle*, 265 U.S. 332, 343 (1924) ("In this country, the practice of pledging personal property for loans dates back to early colonial times, and pawnshops have been regulated by state laws for more than a century.").

Finally, and again in a similar vein, the Court in *BFP* clarified that while it is not strictly necessary for Congress to "override historical state practice expressly or not at all," and that the Bankruptcy Code can supersede state-law property rules "by implication," it may do so only "when the implication is unambiguous." *BFP*, 511 U.S. at 546 (internal quotation marks omitted). "[W]here the intent to override is doubtful," the Court stressed, "our federal system demands deference to long-established traditions of state regulation." *Id.*

To be sure, *BFP* is not quite on all fours—it addressed a different section of the Code, and it dealt with mortgage foreclosures rather than pawn transactions. But its upshot for this case is clear. Given the acknowledged background principle at work here—namely, that property is created and defined by state law—we should hold that the Bankruptcy Code prevents and counteracts the ordinary operation of Georgia's pawn statute only if we find some clear textual indication that Congress intended that result. As explained below, we don't.

**2**

19

At first blush, the likeliest candidate to accomplish the "freezing" that Wilber's position entails might seem to be the Bankruptcy Code's automatic-stay provision, 11 U.S.C. § 362(a). As it turns out, though, Section 362(a) has no application to the particular circumstances of this case.

Section 362(a) states that a bankruptcy petition "operates as a stay, applicable to all entities," of assorted acts and occurrences, including (1) the "commencement or continuation" of certain "judicial, administrative, or other action[s] or proceeding[s]," (2) the "enforcement" of certain pre-petition "judgment[s]," (3) any "act to obtain possession of property of the estate," (4) any "act to create, perfect, or enforce" pre-petition liens, and (5) any "act to collect, assess, or recover" a pre-petition claim against the debtor. *Id*. In so doing, we have said, the automatic stay "relieves the debtor from financial pressure during the pendency of bankruptcy proceedings" and "protects creditors by preventing the premature disbursement of the bankruptcy debtor's estate." *Carver v. Carver*, 954 F.2d 1573, 1576 (11th Cir. 1992).

Although Wilber doesn't particularly press the position, some courts considering cases like this one have held that following a bankruptcy petition's filing, the automatic-stay provision applies to toll an as-yet-unexpired state-law redemption period indefinitely, thereby preventing the period from lapsing and (in effect) keeping pawned assets in the estate. *See, e.g.*, *Cash Am. Pawn, L.P. v.*

20

*Murph*, 209 B.R. 419, 423 (E.D. Tex. 1997) (describing the "minority position").

We reject that view for two reasons. First, it ignores 11 U.S.C. § 108(b)'s specific tolling provision—which, as explained above, expressly extends a debtor's state-law grace period, but only temporarily, for a finite term of 60 days. *See supra* at 5. Reading the automatic-stay provision to effect an open-ended extension of a state-law redemption period not only would impermissibly allow the "general" Section 362(a) to control the more "specific" Section 108(b), *contra, e.g.*, *Bloate v. United States*, 559 U.S. 196, 207 (2010), but also (and worse) would render Section 108(b) entirely superfluous, *contra, e.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009). The far better understanding, we think, is that "Section 108(b) and section 362(a) are mutually exclusive; anything temporarily stayed under the specific language of section 108(b) is not indefinitely stayed by the more general language of section 362(a)." *In re Maanum*, 828 F.2d 459, 460 (8th Cir. 1987); *see generally* 3 *Collier*, *supra*, ¶ 362.03 ("[T]he majority view is that the automatic stay does not toll the running of redemption and reinstatement periods if the sale becomes effective without further action by any entity at the end of such period, and that relief for the debtor is to be found in the automatic 60-day extension of section 108(b).").

Second, and separately, any "freezing" argument founded on the automatic stay misunderstands Section 362(a)'s particular language, which specifically

21

targets the affirmative conduct of creditors.  Again, the automatic-stay provision applies to prevent "entities" from (for instance) "commenc[ing]" actions, "issu[ing]" process, "enforc[ing]" judgments, and "perfect[ing]" liens.  11 U.S.C. § 362(a).  While Section 362(a)'s text undoubtedly prevents creditors from taking steps to actively pry assets out of a debtor's estate, it does not separately prevent those assets from evaporating on their own—as here, "automatically"—pursuant to the ordinary operation of state law.  *See, e.g.*, *In re Canney*, 284 F.3d 362, 372–73 (2d Cir. 2002) ("The automatic stay prevents only certain affirmative acts taken by a creditor, and the running of time is not one of those acts."); *Johnson v. First Nat'l Bank of Montevideo*, 719 F.2d 270, 276 (8th Cir. 1983) (observing that Section 362(a)'s language demonstrates that "Congress intended … to prohibit only certain types of *affirmative actions*" (emphasis in original).[8]

But enough of Section 362(a), which isn't the focus of Wilber's argument. Rather, as his "freezing" mechanism, Wilber points to 11 U.S.C. § 541, which he says—with emphasis—"states that the property of the estate is created as of the *commencement of the case*."  Br. of Appellee at 4.  That's certainly true as far as it goes; under Section 541(a), "[t]he commencement of a case"—*i.e.*, the filing of a

---

[8] From the fact that Section 362(a) did not of its own force prevent Wilber's redemption period from expiring—and thereby lock the Charger into Wilber's estate—it does not necessarily follow that TitleMax erred in seeking relief from the automatic stay before taking steps to possess the car. The lesson of *In re Young*, already discussed, is that a pawnbroker in TitleMax's position is better off safe (asking for leave) than sorry (bulling ahead without court permission). *See supra* at 7–8.

petition—"creates an estate," which includes, among other things, "all legal or equitable interests in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). But Section 541 neither clearly says nor unambiguously implies, *see BFP*, 511 U.S. at 544–45, that a bankruptcy estate, once created, necessarily remains static. The textual indicators, in fact, point in the opposite direction, and suggest that an estate is not necessarily "frozen in time," but rather can, in certain circumstances, expand or contract in accordance with the operation of underlying state-law property rules. *Cf.*, *e.g.*, 11 U.S.C. §§ 541(a)(6)–(7), 541(b)(8) (specifying instances in which property may be added to or excluded from the bankruptcy estate based on post-petition events).[9]

Properly understood, the Bankruptcy Code takes an estate's constituent property interests as it finds them. If an asset is by its state-law nature static, then it remains so in the bankruptcy estate. If, by contrast—as is often the case—state

---

[9] The dissent criticizes our citation to 11 U.S.C. §§ 541(a)(6)–(7) and 541(b)(8), but ultimately does not fundamentally dispute the limited (but key) proposition for which we cite them— namely, that bankruptcy estates are not necessarily set in stone, but rather can and do expand and contract based on post-petition events. *See* Dissenting Op. at 44–45. As to the dissent's "*expressio unius*"-based suggestion, *see id*., that Section 541(b)(8) implicitly (and "permanently") *includes* in a debtor's estate unredeemed property in a title-pawn transaction like the one here—in which the debtor retains physical possession—by specifically excluding from the estate unredeemed property in an ordinary pawn transaction—in which the creditor takes possession—we can only say that we think that it stretches the negative-implication canon too far. *Cf*. Hon. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) (noting that "[v]irtually all the authorities who discuss the negative-implication canon emphasize that it must be applied with great caution, since its application depends so much on context"). That Congress decided *as a matter of federal law* to exclude several specific asset types from a debtor's estate in no way convincingly implies that Congress thereby meant to forestall the ordinary operation of *state-law* rules that define the constituent property rights that comprise the estate.

23

law imbues an estate asset with a sort of internal dynamism, then that characteristic will follow the asset into the estate. Such dynamism will often (and perhaps typically) increase an estate asset's value—take, for example, the post-petition interest that accumulates on a debtor's deposit account, which, pursuant to the traditional state-law "interest follows principal" rule, presumably inures to the account's (and thus the estate's) bottom line. *Cf. Phillips v. Washington Legal Found.*, 524 U.S. 156, 165 (1998) ("The rule that 'interest follows principal' has been established under English common law since at least the mid-1700's.").

But increase will not always be the result—sometimes the dynamism will reduce (or even eliminate) an asset's value. Think, for instance, about a debtor whose bankruptcy estate includes an option contract. If the debtor fails to exercise the option in accordance with state law, then the right to buy disappears. This case reflects the same basic phenomenon. Under Georgia's pawn statute, following his loan's maturity date, Wilber had a conditional right to possess the Charger as well as a right to redeem it during the statutory period. But after the expiration of the prescribed period, Wilber had no rights in the car, possessory or otherwise. Rather, his rights had been "automatically … extinguished" and "automatically forfeited to [TitleMax]." Ga. Code Ann. § 44-14-403(b)(3).

Finding no clear indication that Congress intended to do so, *see BFP*, 511 U.S. at 544–45, we must reject Wilber's contention that 11 U.S.C. § 541 "froze[]"

24

his bankruptcy estate's assets at the time he filed his initial petition, and thereby thwarted the normal operation of the Georgia pawn statute's automatic-extinguishment provision. Accordingly, we hold that when Wilber's redemption period lapsed on December 29, 2015, his rights in the Charger were immediately forfeited, extinguished, and vested in TitleMax.[10]

## C

That's the end of the road for us. Because we hold that the car ceased to be property of the bankruptcy estate upon the expiration of the redemption period, it follows that 11 U.S.C. § 1322(b)(2)—on which the district court founded its ultimate conclusion, and on which the dissent predicates its analysis, *see* Dissenting Op. at 41–47—has no field of application to this case. Under that provision, a Chapter 13 plan can "modify the rights of holders of secured claims" on property in the estate. 11 U.S.C. § 1322(b)(2). It is axiomatic, though, that a plan can "modify … rights" arising under a "claim" only if the claim exists at the

---

[10] The dissent expresses a concern that our decision creates "a bizarre incentive for Chapter 13 litigants" in that, the dissent speculates, "Georgia debtors in a title pawn situation will be in a rush to confirm their Chapter 13 plans" before the statutory grace period lapses—thereby preventing automatic forfeiture under Georgia's pawn law—"while Georgia title pawn lenders will be incentivized to deliberately delay confirmation until after the redemption period expires." Dissenting Op. at 45–46. But of course there are plenty of policy-based arguments to go around. The dissent's view, for instance—in which physical possession of the vehicle makes all the difference, *see id.* at 44–45—would incentivize pawnbrokers to repossess vehicles immediately upon default, even during the pendency of the redemption period, which Georgia law clearly permits. *See* Ga. Code Ann. § 44-12-131(a)(3). That, needless to say, would leave downtrodden debtors even worse off, and almost certainly less able to claw their way back to solvency. All of which, we think, confirms the imprudence of interpreting statutes by reference to the goodness or badness of particular consequences or outcomes.

time the plan would purport to modify the rights associated with it—namely, at confirmation.  Here, by the time the bankruptcy court confirmed Wilber's Chapter 13 plan on February 9, 2016, TitleMax didn't have a mere "claim"—it had (by operation of Georgia law) a 2006 Dodge Charger.

*  *  *

A brief coda:  Having endeavored along the way to meet our dissenting colleague's specific objections, we must respond briefly to his more sweeping charge that we have "disregard[ed]" or cavalierly "passe[d] by" settled procedural rules in a conscious effort to "move to the merits"—only, he says, to adopt a rule that "undermines long-established principles of bankruptcy law and the Code itself, and runs contrary to the purpose of Chapter 13 bankruptcy."  Dissenting Op. at 29–30, 47.  With the utmost respect, none of that is true.

The former intimation—that we've somehow bent normal procedures in a headlong rush to parse the U.S. Bankruptcy Code—seems to us to refute itself.  That's not how courts should operate, and it's not how we operate—and, let's just say, the temptation to cut corners is not particularly strong (which is to say nonexistent) when the reward for doing so is an exhaustive assessment of Chapter 13, Georgia's "pawn" statute, and those laws' combined import for the fate of a 2006 Dodge Charger.  (If anything, the incentives would seem to run in the other direction, but we digress.)  Here as always, we're just doing our best to call 'em

26

like we see 'em.  And needless to say, we find no particular joy in concluding that a pawnbroker now owns the car that Mr. Wilber once drove.  For better or worse, that's simply the result that, on our reading, the law requires.

As for the dissent's suggestion that our interpretation of the Bankruptcy Code is in any way extraordinary, suffice it to say that the record demonstrates otherwise.  Indeed, quite the contrary, the rule that we adopt has been embraced by a number—and seemingly a clear majority—of bankruptcy courts deciding materially identical cases.  *See* Hon. W. Homer Drake, Jr., Hon. Paul W. Bonapfel & Adam M. Goodman, *Chapter 13 Practice and Procedure* § 14.16 (2017) (cataloguing numerous decisions holding that "forfeiture occurs if the debtor does not redeem the vehicle within the redemption period, as extended by Code § 108(b)," and that "if the debtor does not timely redeem, the property is not property of the estate and a plan cannot modify the pawnbroker's claim").[11]  So

---

[11] *See also, e.g.*, *In re Holt*, No. 16-12150, 2017 WL 892333, at *2 (Bankr. N.D. Ga. 2017) (Drake, J.) (holding that "as of the expiration of the redemption period, the [d]ebtor no longer had any interest in the [v]ehicle under Georgia law, and the [v]ehicle ceased to be property of the estate"); *In re Stanfield*, No. 15-50612, 2016 WL 669472, at *3 (Bankr. S.D. Ga. 2016) (holding that when the debtor failed to redeem in accordance with state law, "any legal or equitable interest that [he] possessed was extinguished, the [v]ehicle was no longer property of the estate, and the automatic stay ceased to apply"); *In re Jones*, 544 B.R. 692, 701 (Bankr. M.D. Ala. 2016) (holding that because the debtor failed to redeem in accordance with state law, "she cannot now redeem her collateral under applicable law, nor modify [the creditor's] contract rights in her Chapter 13 plan"); *Cash Am. Pawn, L.P. v. Murph*, 209 B.R. 419, 423 (E.D. Tex. 1997) (holding that "when the [d]ebtors failed to exercise the right of redemption within the 60 day extension provided by § 108(b), they no longer had any legal or equitable interest in the collateral and it ceased to be part of the bankruptcy estate"); *In re Jackson*, 133 B.R. 541, 546–47 (Bankr. W.D. Okla. 1991) (holding that "[s]ince debtors failed to redeem the collateral within [the extended grace] period, they no longer have a property interest in the collateral, and the debt … may not

while this is admittedly a tough case, with respectable arguments on both sides—and while we appreciate and admire the vigor with which the dissent has pressed its position—today's decision is in the heartland of mainstream bankruptcy law, practice, and precedent.

## IV

For the foregoing reasons, we REVERSE the district court's judgment and REMAND for proceedings consistent with this opinion.

---

be administered or otherwise dealt with through debtors' Chapter 13 plan"); *In re Hand*, 52 B.R. 65, 66 (Bankr. M.D. Fla. 1985) (holding that "due to the debtors' failure to redeem within the 60 days, the right to redeem was terminated and the debtors' interest in the property was permanently extinguished" and that "the right is no longer part of the estate"); *cf. also, e.g., In re Oglesby*, No. 01-4072, 2001 WL 34047880, at *4 (holding that "when [d]ebtors failed to exercise their right of redemption within the sixty-day extension provided by § 108(b), any legal or equitable interest they possessed in the vehicle ceased to be part of their bankruptcy estate"); *In re Dunlap*, 158 B.R. 724, 728 (M.D. Tenn. 1993) (holding that "[o]nce redemption is no longer possible, the debtor loses any legal or equitable interest in a pawned good, and thus this good cannot be considered part of the bankruptcy estate," and the "debtor may not seek to cure or modify the pawn contract under § 1322, because this remedy applies only to goods in which the estate retains an interest").

28

WILSON, Circuit Judge, dissenting:

This should be an easy case. The Bankruptcy Code provides—and the Supreme Court and this Circuit agree—that a confirmed Chapter 13 bankruptcy plan enjoys a preclusive, binding effect. A creditor may only escape treatment under a plan if it objects to plan confirmation and then appeals the overruling of that objection. Title Max admitted to the bankruptcy judge, on the record, that it did not object, and the bankruptcy judge confirmed the plan. Title Max now says that it did object and that it therefore can elude the plan's terms. But the law required an objection before plan confirmation, not a retroactive recasting of motions as objections. Therefore, Title Max remains bound by the confirmed plan.

The majority disregards these simple facts, choosing instead to move to the merits. In doing so, the majority rewards Title Max—by allowing it to sidestep the preclusive effects of a confirmed bankruptcy plan—for changing litigation positions on appeal. I am troubled that we would incentivize an attorney's inconsistent representations before the courts of this Circuit, including before the judges of this panel, and I thus cannot join the majority's opinion. Aside from these concerns, I am skeptical of the majority's holding that state law may operate to divest a federally-created bankruptcy estate of a piece of property that all parties, and the majority, admit entered that estate pursuant to the Bankruptcy Code. Such a holding undermines long-established principles of bankruptcy law

29

and the Code itself, and runs contrary to the purpose of Chapter 13 bankruptcy.

Therefore, I respectfully dissent.[1]

## I.

We review a bankruptcy court's legal findings de novo and its factual

findings for clear error. *In re JLJ Inc.*, 988 F.2d 1112, 1116 (11th Cir. 1993).

Whether a party made an objection is a factual finding subject to clear error

review.[2] *Smith v. Estelle*, 562 F.2d 1006, 1007 n.2 (5th Cir. 1977)[3] ("The district

---

[1] The majority seeks to limit the material parts of its decision to the facts of this case. *See, e.g.*, Maj. Op. at 7 ("In the particular circumstances of this case"); *id.* at 9 ("on the unique facts of this case"); *id.* ("in the circumstances presented here"); *id.* at 11 ("in the particular (and peculiar) factual and procedural posture in which this case arises"). However, a published opinion enjoys precedential status, binding future panels of this Circuit, the district courts, and the bankruptcy courts. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001). An unpublished opinion would have limited this decision to the "particular" and "peculiar" facts of the case. *See* Eleventh Circuit I.O.P. 6 ("Opinions that the panel believes to have no precedential value are not published."). Additionally, there is little reason to believe that this case is "peculiar," as TitleMax found itself in the same procedural posture in these two consolidated appeals. It has also litigated from similar postures in other cases in the bankruptcy courts. *See, e.g.*, *In re Thompson*, No. 13-11235, 2014 WL 1330110 (Bankr. S.D. Ga. Mar. 31, 2014).

[2] The majority gives short shrift to the standard of review in this case. It merely states that this appeal "presents questions of law, which we review de novo." It asserts that because Title Max "freely admits" that it "didn't formally 'object' to [plan] confirmation," this dissent's Part I, explaining the appropriate clear error review, is "beside the point." However, far from "freely admit[ting]" that it failed to object, Title Max here repeatedly asserts that it did object, and actively challenges the bankruptcy court's factual finding that it did not object. *See, e.g.*, Appellant's Br. at 23 n.11 ("The [bankruptcy] court was . . . well aware that TitleMax objected to the plan before the confirmation order was entered. This is why the bankruptcy court erred in finding that TitleMax failed to object to the proposed plan before it was confirmed . . . .").

Further, by recognizing that Title Max "did enough to preserve its position," the majority necessarily implies that Title Max did need to take some action in order to do so. *See* Maj. Op. at 9 ("We hold, though, that on the unique facts of this case, TitleMax . . . adequately preserved its position . . . ."); *id.* at 9–10 ("[TitleMax's] argument was adequately teed up" in order to "preserve its position."); *id.* at 11 ("TitleMax did enough to preserve its position."). Whether Title Max took that action is a finding of fact, as noted above. The majority wholly ignores the bankruptcy court's finding that Title Max did not take this action, and instead makes the finding

30

court concluded that Smith had not objected . . . , and this finding is not clearly erroneous."); *accord In re AFY*, 734 F.3d 810, 819 (8th Cir. 2013) (noting that a finding that a party did not object is a finding of fact); *Ham v. Pattersron*, 474 F. App'x 386, 387 (4th Cir. 2012) (per curiam) (treating a district court's finding that a party did not file objections as a finding of fact); *R.H. Cochran & Assocs., Inc. v. Sheet Metal Workers Int'l Ass'n Local Union No. 33*, 335 F. App'x 516, 519–20 (6th Cir. 2009) (applying clear error review to whether an objection was raised); *Clark v. Foti*, 50 F.3d 1032, 1995 WL 136127, at *1 (5th Cir. 1995) (per curiam) ("The district court clearly erred in finding that Clark had failed to file any objections.").

We refuse to find clear error unless we are left "with the *definite and firm conviction* that a mistake has been committed." *Coggin v. Comm'r*, 71 F.3d 855, 860 (11th Cir. 1996) (emphasis added). We "may not substitute our own findings of fact for that of the district court, and may reverse only if the record lacks substantial evidence to support" the finding below. *Id.* (internal quotation mark omitted). When there are "two permissible views of the evidence, the factfinder's

---

itself under an apparent de novo standard. It therefore deprives the bankruptcy court of the deferential clear error standard of review to which it is entitled.

[3] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that all decisions of the "old Fifth" Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit).

choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511 (1985).

Here, the bankruptcy court specifically found that "Title Max failed to timely object to [plan] confirmation," and that Title Max "slept on its rights by not timely objecting."[4] Title Max repeatedly confirmed this to the bankruptcy judge, affirming that it indeed did not object.[5]

Despite whatever recharacterizations Title Max and the majority make—which I reject below—a clear error review of the bankruptcy judge's finding that Title Max did not object is insurmountable. Far from being left with a definite and firm conviction that the bankruptcy judge made a mistake in this finding, a review of the record reveals ample evidence to support the fact that Title Max *affirmatively declined* to object. This comes primarily in the form of Title Max's repeated admissions on the record that it did not object after repeated questioning from the bankruptcy judge. I can think of no stronger evidence to support the bankruptcy judge's finding in this matter.

---

[4] *In re Wilber*, 551 B.R. 542, 548 (Bankr. M.D. Ga. 2016) [hereinafter Bankr. Order].

[5] Audio File for Doc. 16 at 07:57, *In re Northington*, 550 B.R. 644 (Bankr. M.D. Ga. 2016) (No. 15-40877-JTL) [hereinafter Bankr. OA] (Title Max stating that "we did not . . . object in this case" because once the redemption period expired the vehicle was forfeited); *id.* at 17:44 (bankruptcy judge: "I can take judicial notice . . . that there was no objection [to confirmation] . . . . You're not contending that . . . your client objected to confirmation?" Title Max: "No. There's no contention in either case, Your Honor."); *see also* Minute Entry for Doc. 15, *Wilber*, 551 B.R. 542 (No. 15-40962-JTL) (incorporating into *Wilber*'s docket Audio File from *Northington*).

32

Therefore, given the extremely deferential standard of review applicable to this case, I would affirm the bankruptcy court's decision and find that Title Max did not object to plan confirmation and is therefore bound by the confirmed plan. However, I write further here because the majority commits legal error in applying an incorrect standard of review, under which I would still affirm. Moving past the objection issue, the majority then endorses a rule that will impede the effectiveness of our bankruptcy system and will undermine its purpose.

## II.

Judges should be able to rely upon representations made to them by attorneys. Indeed, a "lawyer's representations have long been accorded a particular expectation of honesty and trustworthiness." *Fire Ins. Exch. v. Bell*, 643 N.E.2d 310, 312 (Ind. 1994); *see also* Model Rules of Prof'l Conduct r. 3.3 (Am. Bar Ass'n 2016) (explaining a lawyer's duty of candor toward a tribunal). Under any standard of review, the record indicates that Title Max expressly stated to the bankruptcy judge that it did not object to plan confirmation. I see no reason why the bankruptcy judge should have been required to doubt this attorney's representation. However, after today's ruling, bankruptcy judges in this Circuit will no longer be able to safely take an attorney at her word with respect to confirmation objections (or lack thereof). Rather, these judges will need to scour the docket prior to each confirmation hearing, looking for any filings that could

33

possibly be construed as objections to confirmation, lest they be transformed into objections on appeal. This outcome nullifies the point of giving the moment of plan confirmation any weight, and, simply put, imposes additional work on bankruptcy judges without justification.

This is not the normal case of an objection preserving a position for appeal, as the majority puts it. Rather, a confirmed Chapter 13 bankruptcy plan has a specially codified, broadly defined, binding and preclusive effect. 11 U.S.C. § 1327(a). When a party has notice of an impending plan confirmation, its failure to object to that confirmation precludes its post-confirmation challenge to the terms of the plan. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 276, 130 S. Ct. 1367, 1380 (2010); *see Hope v. Acorn Fin., Inc.*, 731 F.3d 1189, 1193–95 (11th Cir. 2013) ("If a trustee, like a debtor or creditor, is obliged to make a timely objection to the confirmation of a plan, and foregoes an objection she is aware of, it is difficult to see why the trustee, like a debtor or creditor, would not also be bound by confirmation."); Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy* § 229.1 ¶ 3 (4th ed. 2010) [hereinafter Lundin] ("[T]he creditor that fails to object to confirmation and then to appeal an adverse decision is bound by the confirmed plan." (footnote omitted)).[6]

---

[6] *See also In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000) ("It is a well-established principle of bankruptcy law that a party with adequate notice of a bankruptcy proceeding cannot ordinarily attack a confirmed plan . . . . The reason for this is simple . . . . [A]fter the affected parties have

Plan confirmation even binds a creditor to an "illegal" plan provision unless the creditor has objected and appealed. Lundin § 229.1 ¶¶ 3, 77; *see Espinosa*, 559 U.S. at 275, 130 S. Ct. at 1380 (noting that even though the bankruptcy judge committed legal error in confirming a plan, the confirmation order remained "enforceable and binding" on the creditor because it "had notice of the error and filed to object or timely appeal"). In short, § 1327(a) prohibits rewarding litigants who "sleep on their rights" by failing to object to confirmation. *Espinosa*, 559 U.S. at 275, 130 S. Ct. at 1380; *In re Young*, 281 B.R. 74, 80 (Bankr. S.D. Ala. 2001). As was pointed out at oral argument,[7] "a lot rides" on whether a creditor objected to plan confirmation due to the confirmation's conclusive and preclusive effect.[8]

---

an opportunity to present their arguments and claims, it is cumbersome and inefficient to allow those same parties to revisit or recharacterize the identical problems in a subsequent proceeding."); *In re Simpson*, 240 B.R. 559, 562 (B.A.P. 8th Cir. 1999) ("The sum of the judicial decisions that have considered the statutorily binding effect of a confirmed plan . . . is that if the confirmed plan treats the creditor, and if the creditor received proper notice of the plan and its proposed confirmation, the creditor's only potential remedy for a plan it doesn't like is to appeal the order of confirmation . . . . IMPAC cannot now raise issues it could have and should have raised by objecting to confirmation and in an appeal of the confirmation order.").

[7] *See* Oral Argument Recording for Case 16-17467, at 06:56 (Aug. 22, 2017) [hereinafter 11th Cir. OA], http://www.ca11.uscourts.gov/system/files_force/oral_argument_recordings/16-17467.mp3?download=1.

[8] The majority states that I would "affirm on res-judicata grounds." However, I would affirm on the broader § 1327(a) grounds. *See generally* Lundin § 229.1 ¶¶ 4–7 (explaining that "the statutory formulation of binding effect in § 1327(a) is broader than the res judicata effect of an ordinary judgment in the federal courts").

35

Any party in interest may object to plan confirmation.  11 U.S.C. § 1324(a).

Such an objection must be filed and served upon the relevant parties, Fed. R.

Bankr. P. 3015(f), and is to be made by motion, with "reasonable notice and

opportunity for hearing" afforded to the party opposing the motion.  Fed. R. Bankr.

P. 9014(a).  Objections to confirmation "may not be combined with other requests

for relief."  M.D. Ga. Local Bankr. R. 9004-1(a)(2).

Here, Title Max filed no objections to plan confirmation styled as such.  It

filed a "Motion for Relief from the Automatic Stay."[9]  Although Title Max

concedes that under Fed. R. Bankr. P. 3015(f), it was required to "lodge an

objection *before* the plan [was] confirmed," it asserts "[t]hat is precisely what [it]

did" by filing its motion.  Appellant's Br. at 23 n.11.  Title Max contends that its

motion made the bankruptcy court "well aware that TitleMax objected to the plan

before the confirmation order was entered." *Id.*  The majority agrees, and notes

that Title Max "appeared at the hearing, and later filed post-hearing briefs, to

reiterate its position."

This is simply not true.  Title Max *did not* object to the confirmation of the

plan, and the bankruptcy court was certainly not aware of the company's

---

[9] The relevant timeline in the bankruptcy court is as follows:  Title Max filed its motion for relief from the automatic stay on January 8, 2016.  A confirmation hearing was held and the plan was orally confirmed on January 21, 2016.  The bankruptcy court heard oral argument on Title Max's motion on February 2, 2016, in which the parties requested and received additional time to brief the issues raised by the motion.  On February 9, 2016, the court entered its written order formally confirming the plan.  The court denied Title Max's motion on April 29, 2016.

objections prior to confirmation.[10]  Appearing before the bankruptcy court at the oral argument on its motion, Title Max *affirmatively stated*—repeatedly—that it *did not* object and *had not* objected to plan confirmation.[11]  Now, however, the company has represented to this court that it "objected . . . *before* the bankruptcy court entered the Chapter 13 confirmation order," Appellant's Br. at 20, and that its motion for relief from stay "itself constituted an objection to the terms of the proposed plan."  11th Cir. OA at 02:37.

Perhaps most incredibly, Title Max told this court that it had appeared before the bankruptcy court "arguing the merits of [its] objection before the confirmation order was entered," *id.* at 06:03, and was "lodging and arguing a merits objection before there was a confirmation order."  *Id.* at 06:16.  The purported objections to which Title Max refers occurred during the very hearing where Title Max specifically disclaimed any objection to plan confirmation, despite repeated promptings from the bankruptcy judge.  Bankr. OA at 07:57, 17:44.

---

[10] *See* Bankr. OA at 00:45 (bankruptcy judge: "We've confirmed both plans and there are no objections."); *id.* at 03:31 (bankruptcy judge: "For some reason, the creditor [Title Max] didn't object . . . .  So, the question on my mind . . . is what is the effect of confirmation of the plan that the creditor didn't object to it.  The creditor knew about the case, because creditor filed . . . a motion for a relief before the hearing on confirmation, but for some reason, the creditor didn't object . . . ."); *see also* Bankr. Order at 548 ("Title Max failed to timely object to confirmation. Title Max slept on its rights by not timely objecting.").

[11] Bankr. OA at 07:57 (Title Max stating that "we did not . . . object in this case" because once the redemption period expired the vehicle was forfeited); *id.* at 17:44 (bankruptcy judge: "I can take judicial notice . . . that there was no objection [to confirmation] . . . .  You're not contending that . . . your client objected to confirmation?"  Title Max: "No. There's no contention in either case, Your Honor.").

37

Such behavior constitutes more than mere stylistic oversight, as the majority would treat it. It is a fact—Title Max did not object. But it now wishes to recast its motion as an objection, adopting a favorable appellate litigation position contradicting the one it adopted below. Bankruptcy law does not allow this. It requires a proper objection to plan confirmation in order to mount a challenge to the terms of the plan.

The majority's holding allows companies such as Title Max to advance novel legal arguments with no litigation risk. Title Max takes part in the post-confirmation litigation with the safe backstop of the already-confirmed plan, in which it receives nearly the entire benefit of its bargain—payment in full, plus five percent interest. If Title Max wins, it gets a pro-title-lender rule to advance in other cases (and a 2006 Dodge Charger). If it "loses," it gets the cash equivalent of a 2006 Dodge Charger, plus five percent interest. This is precisely the "two bites at the apple" problem that rules like the one in § 1327(a) seek to prevent, and that this court has prohibited in the past. *See, e.g.*, *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 543 (11th Cir. 2002) (en banc) (creating new pleading rule to prevent a plaintiff from getting "two bites at the apple" and "reap[ing] several benefits without taking any risks").

The majority notes that the pawnbroker in *In re Young* did not "in any way contest the plan's consummation," and therefore *Young* "provides a useful (and

38

stark) contrast" to the case at bar. Here, however, not only did Title Max do absolutely nothing to contest confirmation—it *actively asserted that it did not object* to confirmation. This behavior far surpasses that of the pawnbroker in *Young*. Title Max did not merely sleep on its rights; it woke up, entered an appearance, and then affirmatively renounced them.

The majority also correctly notes that the Fifth Circuit's brief ruling in *In re Boyd*, 11 F.3d 59 (5th Cir. 1994), "isn't quite on point." In that case, a former debtor, in what appears to have been an attempt to reclaim his house, "filed his Chapter 13 petition thirty-three months after the foreclosure sale had been concluded," which sale included his eviction and divested him of all rights in the property. *Id.* at 61. In essence, Boyd (likely fraudulently) listed property on his plan that was not his. The Fifth Circuit rejected his argument that his confirmed plan "magically revest[ed] Boyd with property that was never property of Boyd's bankruptcy estate." *Id.* at 60.

All parties, and the majority, concede that the Dodge Charger entered the bankruptcy estate in this case, unlike in *Boyd*. The majority mistakenly focuses on "the pertinent moment of confirmation." The pertinent moment is at the creation of the bankruptcy estate. If, as here, a confirmed bankruptcy plan provides for property of the bankruptcy estate—which is created at the filing of a bankruptcy petition—the plan is binding as to that property. Boyd's attempt to illicitly take

39

back his already-lost house has nothing in common with this case:  Boyd's house never entered his bankruptcy estate.

We should not require bankruptcy judges to do litigants' jobs for them, worrying about construing every motion and filing as an objection to plan confirmation.  "Such a level of clairvoyance is not required by the bankruptcy laws," *Lamarche v. Miles*, 416 B.R. 53, 60 n.8 (E.D.N.Y. 2009), and will threaten the reliability and efficiency of our Circuit's Chapter 13 bankruptcy programs.  *See* Lundin § 228.1 ¶¶ 5–6 (noting that before the Supreme Court's clarification in *Espinosa*, "[m]any courts almost paternalistically (mis)interpret[ed] § 1327 to protect creditors from failing to protect themselves from the effects of confirmation," and so "debtors and creditors couldn't count on § 1327 to produce finality of rights and responsibilities in Chapter 13 cases with great enough certainty to ensure reliable and efficient Chapter 13 programs").

I would reject Title Max's "brazen suggestion" that the bankruptcy judge "should have treated [its] yet to be heard motion in the stead of an actual objection [it] could have easily asserted but chose not to assert at the proper time." *Lamarche*, 416 B.R. at 60 n.8.  Instead, I would give heft to the text of § 1327(a) and incentivize creditors to properly object before confirmation.  Only then will bankruptcy judges have a complete picture when deciding upon confirmation, and will creditors and debtors be able to "find finality and be assured of a settled and

40

orderly resolution of the claims against the debtor." *Id.* at 60. Whatever else, I certainly would not reward litigants for taking an opposite, more convenient position on appeal than the one taken below. Accordingly, I would affirm and find that Title Max's appeal is barred because it failed to object to plan confirmation.

## III.

A bankruptcy court sits in equity. *In re Waldron*, 785 F.2d 936, 941 (11th Cir. 1986) (per curiam). Recognizing this, Congress gave bankruptcy judges great latitude to modify the rights of holders of claims against the bankruptcy estate. In their equitable role, bankruptcy judges must attempt to "accommodate competing goals of financial rehabilitation for the debtor and preservation of the constitutionally protected, bargained-for rights of secured creditors." *In re Johnson*, 165 B.R. 524, 528 (S.D. Ga. 1994). That is exactly what the bankruptcy judge did in this case. After the Dodge Charger entered the bankruptcy estate (an occurrence that nobody contests), the bankruptcy judge changed Title Max's secured claim to the vehicle into a right to loan repayment over the plan period in an effort to assist Wilber's financial rehabilitation. Preserving Title Max's rights, however, the bankruptcy judge provided for Title Max to receive the entire loan amount back, plus five percent interest. The bankruptcy judge had authority to do this under the Bankruptcy Code.

41

The majority, contending that Congress has not spoken on the issue, confuses these straightforward facts by characterizing this case as one of state law deference. To the contrary, Congress has conclusively defined the creation and scope of a bankruptcy estate and has given bankruptcy judges vast authority to alter the rights of those with claims against this estate. Federal bankruptcy law thus controls, and state law cannot operate to alter the bankruptcy estate after its creation—and it certainly cannot serve to dispossess the bankruptcy estate of property. That is not to say that state law plays no role in bankruptcy, however.

The filing of a Chapter 13 petition creates a bankruptcy estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). All such property, "wherever located and by whomever held," becomes a part of the bankruptcy estate on the filing date. *Id.* State law serves to define the property interest and rights that enter the bankruptcy estate on that date. *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918 (1979) ("Property interests are created and defined by state law.").

Once a piece of property becomes part of the bankruptcy estate, creditors step forward with their claims against that property. In Georgia, if, as is relevant here, the bankruptcy estate is created during the statutory grace period of redemption, a vehicle title lender has a secured claim—a "lien on the [vehicle] pawned for the money advanced, interest, and pawnshop charge[s] owed."

42

O.C.G.A. § 44-14-403(a); *see* 11 U.S.C. § 101(5)(A).  The bankruptcy estate

contains the vehicle itself.  *See* 11 U.S.C. § 541(a)(1); O.C.G.A. § 44-14-403(b)(3).

The bankruptcy court has the "very significant power" to dispose of claims

against this estate and to "modify the rights of holders of secured claims."  11

U.S.C. § 1322(b)(2); *see* Lundin § 104.1 ¶ 1.  Through this ability, the bankruptcy

court can fulfill the purpose of Chapter 13 bankruptcy:  "[T]o enable an individual,

under court supervision and protection, to develop and perform under a plan for the

repayment of his debts over an extended period."  H.R. Rep. No. 95-595, at 118

(1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6079.  Because creditors "must

receive payments only under the [bankruptcy] plan," and may not "harass the

debtor or seek to collect their debts," Chapter 13 serves to "relieve[] the debtor

from indirect and direct pressures from creditors," and to enable the debtor "to

support himself and his dependents while repaying his creditors at the same time."

*Id.*  As such, Chapter 13 can only be effective when the bankruptcy judge has the

authority to equitably modify the rights of *all of those* holding claims against the

bankruptcy estate.

In this case, Wilber's bankruptcy estate was created on the date he filed his

Chapter 13 petition.  Because he filed the petition before his state law redemption

period expired, Wilber, at that moment, had legal title to his car and a right to

redeem it.  The car and the attendant right to redeem became property of the

43

bankruptcy estate on that date.  Title Max retained a secured claim against the bankruptcy estate—a claim that the bankruptcy court modified under § 1322(b)(2), turning it into a structured repayment of the entire loan plus five percent interest.

This should end the inquiry.  Congress provided no mechanism for property of the bankruptcy estate to evaporate.  Congress set the date of bankruptcy estate creation as the date of commencement of the case.  Congress then gave the bankruptcy court plenary control over the disposition of property of the bankruptcy estate and its attendant claims in order to allow debtors to restructure their debts.

However, the majority presses forward, asserting that the Bankruptcy Code's "textual indicators" indicate that property may vanish from the bankruptcy estate. Searching for statutes that "specif[y] instances in which property may be added to or excluded from the bankruptcy estate based on post-petition events," the majority first cites two provisions that permit the *adding* of property to the estate: 11 U.S.C. § 541(a)(6) (including "[p]roceeds, product, offspring, rents, or profits of or from property of the estate") and 11 U.S.C. § 541(a)(7) (including any "interest in property that the estate acquires after the commencement of the case").  These provisions support the supplementing of the bankruptcy estate, not the disappearing of property from it.

44

The majority then cites 11 U.S.C. § 541(b)(8).  Importantly, § 541(b)(8)—

appearing in a list of enumerated exclusions from the bankruptcy estate—

contemplates a situation quite similar to the one at hand:

> Property of the estate does not include . . . any interest of the debtor in property where the debtor pledged or sold tangible personal property (other than . . . written or printed evidences of indebtedness or title) as collateral for a loan or advance of money given by a person licensed under law . . . where—(A) the tangible personal property is in the possession of the pledgee or transferee; (B) the debtor has no obligation to repay the money, redeem the collateral, or buy back the property at a stipulated price; and (C) neither the debtor nor the trustee have exercised any right to redeem provided under the contract or State law, in a timely manner as provided under State law and section 108(b).

11 U.S.C. § 541(b)(8).

Under the interpretative canon of *expressio unius est exclusio alterius*, when

"a legislature has enumerated a list or series of related items, the legislature

intended to exclude similar items not specifically included in the list."  *Christian

Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1193 (11th Cir. 2011).  Even

assuming arguendo that property may leave the bankruptcy estate, Congress's

authoring of this exclusionary provision evinces a congressional intent to

permanently *in*clude Wilber's vehicle in his bankruptcy estate:  The provision

would apply to Wilber's title loan but for the fact that he retained possession of the

vehicle.  If Congress wanted to *ex*clude Wilber's vehicle from his bankruptcy

estate, it would not have specifically required Title Max to retain possession of the

vehicle in order to qualify for the § 541(b)(8) exclusion.

The majority's holding also creates a bizarre incentive for Chapter 13 litigants, and perhaps for bankruptcy courts as well.  It appears as though under the majority's rule, if a plan is confirmed before the expiration of a debtor's vehicle redemption period, the plan may modify the rights of secured creditors with respect to that vehicle under § 1322(b)(2).  If the plan is confirmed after the redemption period expires, however, the vehicle evaporates from the bankruptcy estate, and the plan cannot apply § 1322(b)(2) to the creditor's secured claim.[12]  Therefore, after today's holding, Georgia debtors in a title pawn situation will be in a rush to confirm their Chapter 13 plans, while Georgia title pawn lenders will be incentivized to deliberately delay confirmation until after the redemption period expires.  The random date of redemption period expiration will take on increasing importance in Chapter 13 bankruptcy, and bankruptcy courts will be forced to police the confirmation timetable even more closely.[13]

This awkward recasting of incentives shows the consequence of moving or unbundling the "watershed date" of bankruptcy—the date that "creditors' rights are

---

[12] The majority holds that the Dodge Charger *did* originally enter the bankruptcy estate; it disappeared later. Therefore, going forward, debtors' bankruptcy estates could still include pawned vehicles, at least initially.

[13] The majority takes issue with this incentives concern, asserting that "[t]he dissent's view, for instance—in which physical possession of the vehicle makes all the difference—would incentivize pawnbrokers to repossess vehicles immediately upon default." (citation omitted). However, the fact that physical possession of a pawned item "makes all the difference" in a § 541(b)(8) analysis is not merely "[my] view," it is the view of Congress, as codified in the Bankruptcy Code. *See* § 541(b)(8)(A).

fixed (as much as possible), the bankruptcy estate is created, and the value of the debtor's exemptions is determined." *See Johnson*, 165 B.R. at 528. Congress set this date as the commencement of the case, 11 U.S.C. § 541(a)(1), but the majority today contrarily moves it to the date of confirmation. This holding allows the scope of the "property of the bankruptcy estate" to remain in flux between commencement of the case and plan confirmation. It adds tremendously to the level of uncertainty encountered in Chapter 13 litigation, runs afoul of the statute, and will only increase the level of gamesmanship before the courts in this Circuit.

The majority—while purporting to look to the implications of the "textual indicators" left to us by Congress—overlooks the actual text of the Bankruptcy Code, the written legislative history behind it, and the practical ramifications of its rule. Congress intended Chapter 13 bankruptcy to enable debtors to *repay* their debts, and to "retain the pride attendant on being able to meet one's obligations." H.R. Rep. No. 95-595, at 118 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6079. It did not intend, and did not write the Bankruptcy Code to allow, for Georgia title pawn lenders to invent loopholes in order to evade the jurisdiction of the bankruptcy courts. Unfortunately, the majority's ruling enables just that.

IV.

Title Max did not object to plan confirmation—the record confirms this under either the appropriate clear error standard, or the incorrect de novo standard

47

applied by the majority. This fact precludes the company from now challenging or escaping from the confirmed plan. The majority passes by this reality on its way to the merits. Once there, the majority, by moving the statutorily-mandated operative date for Chapter 13 bankruptcy, allows state law to strip a federal bankruptcy estate of property. Today's holding is not supported by the Bankruptcy Code and is not justified in its encouraging of manipulation of our federal courts. Because I would not ignore the broad preclusive effect of plan confirmation, and because the Code must take precedence over state law, I respectfully dissent.